Ernest J. HONIGMANN, Plaintiff/Respondent-Cross Appellant,

v.

HUNTER GROUP, INC., et al., Defendants/Appellants-Cross Respondents.

No. 50721.

Missouri Court of Appeals, Eastern District, Division Four.

July 14, 1987.

Francis L. Ruppert, Clayton, for defendants/appellants-cross respondents.

Tom P. Mendelson, University City, for plaintiff/respondent-cross appellant.

GARY M. GAERTNER, Presiding Judge.

This is an appeal from a judgment following a jury verdict in the Circuit Court of the County of St. Louis. The respondent, Ernest Honigmann, sued appellant, Hunter Group, Inc.[1] for breach of contract. In addition, Honigmann sued Robert Cranston (President of Hunter Group, Inc.) and Barry Todd (Vice-President of Hunter Group, Inc.) for tortious interference with his contractual relationship with Hunter Group, Inc. and tortious interference with business expectancy. The jury found in favor of Honigmann on all three counts and awarded him $29,000.00 in actual damages for breach of contract, $29,000.00 in actual damages for tortious interference with business relations, and $5,000.00 in punitive damages against each of the two individual appellants.[2]

Appellants raise a total of eight points on appeal. Appellants challenge the submissibility of respondent's case, claim error in the trial court's denial of appellants' motion for a directed verdict, and find error in the admission of alleged hearsay evidence. We affirm.

The evidence shows that Honigmann purchased a business brokerage franchise[3] from Hunter Group, Inc. (then known as American Business Brokers, Inc.[4]) on April 10, 1980. In July, 1981, Honigmann contacted James Bryant, president of Dixie Cream Flour Company, on the basis of a tip that Bryant was seeking to sell his company. Bryant informed Honigmann that he was interested in selling the business, but that he did not need Honigmann's services at that time because he had a potential buyer. Bryant nonetheless took Honigmann on a tour of the company's facilities and told him that he would be in contact should his potential buyer not complete the deal. Honigmann kept in touch with Bryant over the following months. Bryant then contacted Honigmann in May, 1982, and requested that Honigmann search for a buyer, since Bryant's own negotiations had not produced a sale. Bryant refused to sign Hunter Group, Inc.'s general listing agreement, apparently because of a prior negative experience with a broker. He orally agreed, however, to pay a commission of 10% of the sale price should Honigmann deliver a buyer. Honigmann there-

---

1. Hunter Group, Inc. no longer exists; it is represented by its statutory trustees, appellants Cranston and Todd.

2. The jury also returned a verdict against Honigmann on Hunter Group, Inc.'s counterclaim for unpaid royalties in the amount of $1,200.00.

3. Business brokering is similar to real estate brokering. The business broker brings together sellers and buyers of businesses.

4. For convenience and clarity, we will refer to the corporate appellant as Hunter Group, Inc. throughout this opinion even though its prior name (American Business Brokers, Inc.) was in effect until September 7, 1982.

after obtained financial and corporate information from Bryant about Dixie Cream and prepared a written descriptive profile of the business.

On June 2, 1982, Honigmann and his associate, Dee Quest, introduced Bryant and Michael Whitworth, a prospective buyer. At that time, Bryant signed a "Seller Commission Form" in lieu of a general listing agreement, which provided that Bryant would pay Honigmann a 10% commission if the business were sold to Whitworth. The Franchisor's inter-franchise newsletter of June 18, 1982 stated that "Ernie [Honigmann] has an offer based on a seller commission form [for Dixie Cream]." After three weeks of negotiations, the deal fell through.

Honigmann and Quest met with Bryant shortly after the negotiations with Whitworth terminated. Bryant reconfirmed his desire for them to locate a buyer as well as his intention to pay the commission if they delivered a buyer. Towards this end, Honigmann renewed his efforts to find a buyer. He also updated his written profile of Dixie Cream's financial data on July 14, 1982.

According to Honigmann's testimony, he learned in August, 1982, from Dee Quest that appellants Cranston and Todd had introduced a prospective buyer to Bryant and that Todd had asked Quest to refrain from further contacting Bryant. Honigmann further testified that he never consented to appellants' intervention in the Dixie Cream effort. The testimony of Cranston and Todd is contradictory on this point. Appellants contend that after they learned about the failed Bryant-Whitworth negotiations, they sought and expressly received Honigmann's approval and consent before entering into the Dixie Cream sale activity. Cranston also testified that they would not have pursued the sale without Honigmann's consent.

The evidence further showed that around July 1, 1982, Cranston met with Jim Streett, who was seeking to purchase a business. Cranston informed him about Dixie Cream and Streett eventually purchased Dixie Cream in late December, 1982.

Streett paid approximately $600,000.00 for Dixie Cream. Appellants' testimony was that Street agreed to pay them a fee of $30,000.00, which they considered to be more of a finder's fee rather than a commission because Streett asked them not to perform their usual duties as brokers due to the fact that Bryant refused to negotiate with him if brokers were involved. In point of fact, Streett remitted $20,000.00 in August, 1982, and tendered his final payment of $9,000.00 in early 1983, for a total of $29,000.00. The sum was $1,000.00 less than that agreed upon because of a dispute over the payment of legal services. The checks received from Streett were made out to "Hunter Group," and the funds were deposited into the Franchisor's bank account and treated by it as income.

Todd informed Honigmann in the fall of 1982 that, according to the Franchise Agreement's commission splitting arrangement,[5] he would receive 15% of the expected $30,000.00 commission ($4,500.00), since he was the "territorial franchisee" (the one in whose "exclusive territory" the business was located), but that he was not entitled to an additional 20% as the "listing franchisee" because he had not obtained a general listing agreement from Bryant. Honigmann thereafter filed the instant suit.

Our standard of review is both familiar and clear: We view the evidence and reasonable inferences therefrom in the light most favorable to the prevailing party, which in this case is the plaintiff, Honigmann. *Ross v. Holton*, 640 S.W.2d 166, 170 (Mo.App., E.D.1982).

Appellants' first point alleges that the trial court erred in giving Instruction No. 8, the verdict director for Breach of the Franchise Agreement. They assert that the evidence did not support a finding that Hunter Group, Inc. breached its contract

5. The selling franchisee (the one procuring the buyer) received 65% of the commission, the listing franchisee (who listed the business for sale) received 20%, and the territorial franchisee (in whose territory the business was located) received 15%. Each franchisee owed a 6% royalty to the Franchisor.

with Honigmann. In essence, appellants contend that Hunter Group, Inc., as Franchisor, had the right under the Franchise Agreement to compete with all of its franchisees, including Honigmann, in the listing and selling of businesses. It is Honigmann's contention that Hunter Group, Inc. breached the contract because it was his understanding that only other franchisees, and not the Franchisor, had the right to list and sell businesses in other franchisees' exclusive territories.

The Franchise Agreement contains the following:

1. FRANCHISE

A. The Franchisor grants to the Franchisee an exclusive Franchise (hereinafter referred to as the "Franchise") to operate a business brokerage office under the name of "[HUNTER GROUP, INC.]" in the territory and marketing area set forth in Section 2, below, and, in connection therewith, to use the [HUNTER GROUP, INC.] systems, forms, materials, expertise, procedures, techniques, names and lists of businesses for sale, all as elsewhere herein set forth.

B. Franchisee further acknowledges and agrees that Franchisee's right to use the name "[HUNTER GROUP]", the systems, operations manual, forms, materials, expertise, procedures, techniques and other information is not exclusive, and that Franchisor, in its sole discretion, has the right to operate, franchise and use any or all of the above or grant the rights to their use to other Franchisees under such terms and conditions as Franchisor may desire, provided that Franchisor may not establish another [HUNTER GROUP, INC.] office in the territory and marketing area set forth in Section 2.

As further explication of the agreement's meaning, appellants point to the following section in the Federal Trade Commission (FTC) disclosure document[6] presented to Honigmann before he signed the Franchise Agreement:

[Hunter Group, Inc.]'s Franchisee is granted an exclusive territory, which generally encompasses a territory with a population of approximately 200,000. The size of the Franchise territory is not subject to negotiation. This restriction has been imposed to permit the Franchisee to offer exclusive sales areas, and is based on experience and studies which determined that this size population base is adequate to support a brokerage business.

The Franchisor will not establish another [Hunter Group, Inc.] franchise or a company-owned operation within the exclusive territory. Additionally, the Franchisor will not establish or operate a company-owned outlet or grant a Franchise to engage in a similar business under a different trade name or mark within the Franchisee's exclusive territory. However, the Franchisor and all Franchisees are free to list, sell, and attempt to sell businesses which are not within the exclusive territory of the Franchisee or the Franchisor. In the event Franchisee sells a business outside of its own territory, the commission is split in accordance with the terms outlined in the Franchise Agreement.

The Franchise Agreement does not specifically provide that the Franchisor may compete with its franchisees in the brokering business. The Agreement also contains an explicit fee-splitting arrangement. Further, the FTC disclosure statement states that, "the Franchisor and all Franchisees are free to list, sell, and attempt to sell businesses which are not within the exclusive territory of the Franchisee or the Franchisor." Although not a model of clarity, this sentence describes the overall franchise scheme in which all franchisees and the Franchisor may compete with each other for businesses throughout the franchise system, e.g., not within any franchisee's or the Franchisor's exclusive territory. This interpretation is reasonable when read together with the contract's provisions for

---

6. The Federal Trade Commission requires franchisors to present prospective franchisees with disclosure statements that cover specific topics of the franchise business. 16 C.F.R. § 436 (1979).

splitting commission fees among the territorial, listing, and selling brokers.

■ Where the parties' impart different meaning to a contract's terms, the courts allow extrinsic evidence to determine the true meaning. *Norcomo Corp. v. Franchi Construction Co.*, 587 S.W.2d 311, 319 (Mo.App., E.D.1979). However, no oral or written statements made contemporaneously at the time of contracting are permitted. Appellants, in addition to the Franchise Agreement and the FTC statement, allege in support of their interpretation that: 1) at the time Honigmann purchased his franchise, Hunter Group, Inc. operated a "company-owned outlet" at 7210 Clayton Road (the "Clayton Franchise"); 2) in early 1981, Cranston and Todd sold a 50% interest in the company-owned outlet's license to Loren Egley and Michael Fox; 3) Honigmann admitted at trial that he knew Cranston was part-owner of the Clayton Franchise at the time of the Dixie Cream sale; and 4) Honigmann knew of and participated in splitting commissions with the Clayton Franchise (in 1980, Honigmann split commissions for the sale of a restaurant located in the Clayton territory and for a fitness center listed by the company-owned store).

Honigmann also offers extrinsic evidence as to the contract's true meaning to the parties. According to him, competition between the Franchisor and its franchisees was not part of the agreement for the following reasons: 1) regarding the two 1980 split commissions referred to above, Honigmann testified that he remitted only royalties to the Franchisor and split any commission fees with the Clayton Franchise; 2) Honigmann testified that he never gave his consent to Cranston or Todd to enter the Dixie Cream transaction; 3) Cranston and Todd each wrote responses to Honigmann's pre-litigation request for the Dixie Cream listing commission in which neither mentioned Honigmann having consented to their involvement with Dixie Cream; 4) Cranston testified that he never would have become involved with Dixie Cream without Honigmann's consent; 5) there was no mention of Honigmann's consent until litigation commenced; 6) appel-

lants testified that Honigmann yielded the Dixie Cream sale to them in the first week of July, 1982, which is inconsistent with Honigmann's testimony that he prepared an updated business profile of Dixie Cream dated July 14, 1982; 7) Cranston testified that the Franchisor only received royalties and never received commission fees; 8) Honigmann testified that he had no knowledge of the Franchisor being involved in competing with its franchisees prior to the Dixie Cream episode; 9) the company-owned outlet was sold to Loren Egley and Michael Fox in early 1981; 10) the company-owned outlet thereafter changed its name to Clayton Marketing and operated independently of the Franchisor in terms of accounting procedures and separate bank accounts although it shared office space and secretarial assistance; 11) Loren Egley testified that he had no knowledge of, or involvement in, the Dixie Cream sale activity as co-owner of Clayton Marketing and that his franchise received no commission from the Dixie Cream sale; 12) James Streett, the purchaser of Dixie Cream, paid the commission directly to Hunter Group and not to the Clayton Franchise; 13) Streett's checks were deposited into the Franchisor's bank account; 14) Cranston testified that the Franchisor's role was solely to support its franchisees by maintaining a network system; and 15) the Franchise Agreement required the franchisee to regularly report to the Franchisor its listings and other facets of its business operations, which would be inconsistent with business principles if the two parties were truly in competition.

■ Although the witnesses' testimony is in conflict on this issue, it is the province of the jury to assess and weigh the credibility of the witnesses. *Ross v. Holton*, 640 S.W.2d 166, 171 (Mo.App., E.D.1982). The evidence adduced at trial was sufficient to support a finding that the Franchisor had breached its contract, since the jury could reasonably have found that competition between the Franchisor and its franchisee, Honigmann, was not intended by the parties. Finding no error, this point is denied.

Appellants [7] argue in their second point that the trial court erroneously allowed Honigmann to testify as to what James Bryant, president of Dixie Cream, told him concerning the promised sales commission. Appellants contend that such testimony constituted impermissible hearsay.

The alleged statements relate to the issue of Honigmann's expectation that Bryant would pay him a 10% commission if he found a buyer for Dixie Cream. The evidence is relevant to Honigmann's claim of appellants' tortious interference with his expectancy of brokering the Dixie Cream sale.

■ Missouri case law has long recognized that the dangers inherent in hearsay are inapplicable to situations where the out-of-court statement of one person illuminates and explains the mental state or impression of another. In other words, such out-of-court declarations have an independent relevance and are not uttered for any assertive or testimonial purpose. *Replogle v. Replogle*, 350 S.W.2d 735 (Mo.1961); *Miller v. Brunson Constr. Co.*, 250 S.W.2d 958, 962 (Mo.1952); *Scott v. Missouri Ins. Co.*, 233 S.W.2d 660 (Mo. banc 1950); *Hamra v. Boone County Dev. Co.*, 602 S.W.2d 721 (Mo.App., E.D.1980).

■ We find that Honigmann's testimony that Bryant said he would pay Honigmann a commission upon the delivery of a purchaser for Dixie Cream was independently relevant to Honigmann's business expectancy, and therefore was admissible for the non-hearsay purpose of establishing Honigmann's present state of mind. There was no error committed by the trial court and this point is denied.

In point three of this appeal, appellants allege that the trial court erred in failing to grant appellants' oral motion for a directed verdict made at the close of respondent's case-in-chief. Appellants assert that Honigmann's evidence, and the reasonable inferences derived therefrom, did not establish a basis upon which he could recover.

We note initially that appellants failed to move for a directed verdict at the close of all the evidence. It is a well-established rule that such failure constitutes a waiver. *Millar v. Berg*, 316 S.W.2d 499, 502 (Mo. 1958); *see also Polovich v. Sayers*, 412 S.W.2d 436, 438 (Mo.1967). Appellants have not raised before this court the issue of plain error and we are not obliged to do so *ex gratia*. Although we find that appellants have waived this issue, we choose to briefly discuss the merits of their argument.

■ Once again, appellants contend that there was no breach of the franchise agreement because Hunter Group, Inc.'s sale of Dixie Cream was proper under the Franchise Agreement's terms. Appellants further argue that Honigmann did not have an exclusive right to broker the Dixie Cream business because he had never obtained a general listing agreement from Dixie Cream and his role as the listing broker, based on the seller commission form, ended when the negotiations between Bryant and Whitworth ended.

As stated above under Point One, Honigmann made a submissible case for the jury. The trial court did not err in denying the motion for a directed verdict as to Count I, breach of the Franchise Agreement.

Also under Point Three, appellants argue that Honigmann failed to make a submissible case on Count IV, the tortious interference with business expectancy claim, and Count V, for intentional interference with contract. We address each tort in turn.

■ The tort of interference with a business expectancy is recognized in Missouri. *Downey v. United Weatherproofing*, 363 Mo. 852, 253 S.W.2d 976 (1953); *Briner Elec. Co. v. Sachs Elec. Co.*, 680 S.W.2d 737, 742 (Mo.App., E.D.1984). The action is applicable to both fully formed contracts and mere expectancies. *Cook v. MFA Livestock Ass'n.*, 700 S.W.2d 526, 528–29 (Mo.App., W.D.1985). The elements required to establish the tort, as set forth

---

7. In the remaining points, we use the term "appellants" to refer to Cranston and Todd as opposed to Hunter Group, Inc.

807

in the Missouri Supreme Court opinion of *Fischer, Spuhl, Herzwurm & Assocs., Inc. v. Forrest T. Jones & Co.*, 586 S.W.2d 310 (Mo. banc 1979), are as follows:

(1) A contract or a valid business relationship or expectancy (not necessarily a contract);

(2) Defendant's knowledge of the contract or relationship;

(3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship;

(4) The absence of justification; and

(5) Damages resulting from defendant's conduct.

*Id.* at 315 (quoting *Salomon v. Crown Life Ins. Co.*, 536 F.2d 1233, 1238 (8th Cir.), *cert. denied*, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976). It is also the rule in Missouri that the plaintiff carries the burden of proving the absence of justification for defendant's actions. *Francisco v. Kansas City Star*, 629 S.W.2d 524 (Mo.App., W.D.1981). The plaintiff must support each element of the cause of action with substantial evidence. Id. at 529. Finally, the tort is inapplicable to circumstances considered to be part of the competitive aspects of our free enterprise system. *Tri-Continental Leasing Co. v. Neidhardt*, 540 S.W.2d 210, 219 (Mo.App., E.D.1976).

Appellants allege that the evidence might support finding that Honigmann had a reasonable business expectancy in selling Dixie Cream to Whitworth, and thereby collecting his 10% commission from Bryant, but that such expectancy did not extend once the Whitworth-Bryant negotiations ended. Appellants contend that Honigmann's claim fails for the further reason that they had the right under the Franchise Agreement to find a buyer for Dixie Cream.

Honigmann points out that he had a reasonable, valid expectancy in the sale of Dixie Cream because Bryant renewed his promise to pay Honigmann a commission after the Whitworth deal folded if Honigmann delivered a buyer. Honigmann testified that he thereafter continued to pursue his activities to find a buyer, which included gathering additional financial information on Dixie Cream and preparing an updated summary of Dixie Cream.

As mentioned above, Missouri law requires Honigmann to carry the burden of proof on the issue of whether appellants' interference lacked justification. Honigmann claims that the requisite lack of justification exists in appellants' violation of a confidential, or fiduciary, relationship. *See, McKeehan v. Wittels*, 508 S.W.2d 277, 279–80 (Mo.App., E.D.1974). The existence of a confidential relationship between Honigmann and appellants would necessarily preclude the parties from being competitors. *See Dolton v. Capitol Fed. Sav. & Loan Ass'n*, 642 P.2d 21 (Colo.App.1981) (discussed in *Briner Elec. Co. v. Sachs Elec. Co.*, 680 S.W.2d 737, 742 (Mo.App., E.D.1984)). The Franchise Agreement required Honigmann to report weekly to the Franchisor and to submit with his listings "complete information relative to sales calls made; ... business information developed; ... and any other relevant data." The Agreement also permitted the Franchisor to make random inspections of franchisee's premises, and to obtain any and all records relevant to the conduct of the franchisee's brokering activities.

■■■ We believe that the foregoing evidence was sufficient for Honigmann to sustain his burden on the issue of lack of justification. The type of information shared with the Franchisor was such as to imply a confidential relationship. Since the Agreement is open to interpretation on the issue of whether the Franchisor could compete with its franchisees, the actions by Cranston and Todd as corporate officers of the Franchisor could have reasonably been found by the jury to constitute tortious interference with a business expectancy. Corporate officers are liable if they had knowledge of the corporation's wrong doing and participate in its evolution. *Boyd v. Wimes*, 664 S.W.2d 596, 598 (Mo.App., W.D.1984); *McKeehan v. Wittels*, 508 S.W.2d 277, 283 (Mo.App., E.D.1974).

We now turn to appellants' argument that Count V, the complaint of intentional interference with contract, should have been dismissed for lack of substantial evi-

dence. The elements for the intentional interference with contract, as set forth in M.A.I. 23.11 are:

(1) a contract between the plaintiff and a third party;

(2) a breach caused by the defendant;

(3) an intentional action by the defendant without justification or excuse; and

(4) damage caused to the plaintiff by the resulting breach.

The question of the contract's existence is self-evident. Honigmann's claim is that appellants interfered with the Franchise Agreement by brokering within his exclusive territory. Appellants argue once again that the Franchise Agreement permitted such activity.

As stated above, the meaning of the contract was a matter of interpretation for the jury. Appellants' further contend that they, as officers of the Franchisor Corporation, could not, as a matter of law, commit a tortious interference with a corporate contract. Such statement is offered without citation or authority. Our research shows that while the law in Missouri provides a corporate officer the privilege of inducing interference with the corporation's contract, it is only available where the defendant does not use improper means, acts in good faith to protect the corporation, and does not act on behalf of his or her own personal interests. *Nola v. Merollis Chevrolet Kansas City, Inc.,* 537 S.W.2d 627, 634 (Mo.App., W.D.1976). The jury was free to accept or reject Honigmann's argument that appellants' act in brokering the sale of Dixie Cream constituted improper means (accepting the interpretation that the Franchise Agreement forbids competition by the Franchisor) and even acts in their own personal interests (since the fee was paid to, and deposited in the account of, Hunter Group, Inc. rather than its company-owned outlet). There was sufficient evidence to submit the question of intentional interference with contract regarding its denial of appellants' mo-

tion to dismiss Counts I, IV, and V, to the jury.

Finding no error on the part of the trial court, this point is denied.

Appellants' next point is that the trial court erred in submitting Instruction Nos. 10 and 12 on the tortious interference with contract claim against Cranston and Todd.[8]

Having found above that there was sufficient evidence for the jury to find that the contract did not permit the Franchisor to compete in the franchisee's exclusive territory, it was not error to submit to the jury the question of whether appellants' acts constituted a breach of the contract. Further, appellants' reliance on the privilege that allows a corporate officer to induce the corporation to breach its contract is flawed. Since a privilege is a plea of avoidance or affirmative defense, it must be set forth in a responsive pleading. Rules 55.08, 55.01. This was not done here by appellants. Moreover, the evidence was sufficient to suggest that appellants' actions were improper and for their own personal benefit, since it was claimed that they owed Honigmann a duty under the confidential or fiduciary relationship, created by the franchisor-franchisee arrangement, which they breached by finding a buyer for Dixie Cream. Point denied.

Appellants' next point alleges error in the submission of Instruction No. 9 and Verdict Form B, both of which used the phrase "interference with business relations" to describe the two tortious interference theories asserted against appellants by Honigmann. Appellants claim that this phrase confused and misled the jury because the two theories "require entirely different findings and surround two entirely different sets of facts."

Instruction No. 9, M.A.I. No. 2.05, is an introductory instruction used to preface the package of verdict directors for the various theories presented. Verdict Form B, M.A.I. No. 36.12, is the verdict form for the theories presented. These are not in-

---

**8.** Instruction Nos. 10 and 12 were identical except No. 10 referred to Cranston while No. 12 referred to Todd.

structions that direct the jury in its decision regarding liability. *M.P. Industries, Inc. v. Axelrod,* 706 S.W.2d 589, 592 (Mo. App., E.D.1986). We note that no contemporaneous objections were made as to the jury instructions. It is therefore incumbent upon appellants to make a substantial showing of prejudicial effect. *Fowler v. Park Corp.,* 673 S.W.2d 749 (Mo. banc 1984); *Lipton Realty, Inc. v. St. Louis Hous. Auth.,* 705 S.W.2d 565, 571–72 (Mo. App., E.D.1986); *Smith v. Wohl,* 702 S.W.2d 905, 908 (Mo.App., E.D.1985).

We do not believe the phrase in question was prejudicial. The phrase "business relations" (or variations thereof) has been used by our courts in describing both theories at issue in this case. *See, e.g., Fischer, Spuhl, Herzwurm & Assocs., Inc. v. Forrest T. Jones & Co.,* 586 S.W.2d 310, 315 (Mo. banc 1979); *Teale v. Am. Mfrs. Mut. Ins. Co.,* 687 S.W.2d 218, 219 (Mo.App., W.D.1984); *Buller v. Pulitzer Publishing Co.,* 684 S.W.2d 473, 479 (Mo.App., E.D. 1984); *Bandag of Springfield, Inc. v. Bandag, Inc.,* 662 S.W.2d 546, 554 (Mo. App., S.D.1983). In *Ross v. Holton,* 640 S.W.2d 166 (Mo.App., E.D.1982), this court gave its approval to the use of tendering together instructions on claims (e.g. breach of contract and intentional interference with business relations) where the facts giving rise to the claims are similar. *Id.* at 172–73. Such is the case here, and we find no error in having submitted Instruction No. 9 and Verdict Form B.

Appellants' claim in their next point that the trial court erred in giving Instruction No. 20, MAI No. 16.01, a definition of malice, because this definition allowed the jury to award punitive damages if they found legal malice, whereas appellants assert that actual malice has to be found in order to justify punitive damages. Appellants point to the public policy goal of fostering commerce and state that such a policy will be achieved only by requiring the more stringent requirements of actual malice for recovery under either of the tort theories posited by Honigmann.

Appellants rely on the Missouri Supreme Court case of *Sanders v. Daniel Int'l. Corp.,* 682 S.W.2d 803 (Mo. banc 1984) for the proposition that proof of actual malice is required for recovery of punitive damages. *Sanders* was a malicious prosecution suit and the court's finding was limited to such actions. The court's rationale was that it is considered sound public policy to encourage citizen participation in criminal law enforcement and to not subject the citizen who reports a crime to the risk of liability. We believe this issue is disposed of by *Ross v. Holton,* 640 S.W.2d 166 (Mo. App., E.D.1982), where this court found that "a submissible punitive damages question is made for the jury once the plaintiff has presented sufficient evidence of legal malice—the intentional doing of a wrongful act without just cause or excuse." *Id.* at 174. *See also Stark v. American Bakeries,* 647 S.W.2d 119, 123 (Mo. banc 1983). Finding no error, this point is denied.

Appellants' next argument is that the trial court erred in giving Instructions Nos. 18 and 19, which authorized the jury to grant punitive damages if the jury found against each of the appellants on the two tortious interference with business relations counts. Appellants object on the basis that the instructions given allowed the jury to award punitive damages on both counts even if it found that an appellant's conduct was malicious on only one of the two counts. *See Breece v. Jett,* 556 S.W.2d 696 (Mo.App., E.D.1977). *Cf. Douglas v. Hoeh,* 595 S.W.2d 434 (Mo.App., E.D.1980).

Appellants failed to present this point in their motion for a new trial, and hence, have failed to preserve the alleged error for review. Rule 78.07; *St. John Bank & Trust Co. v. City of St. John,* 679 S.W.2d 399, 404 (Mo.App., E.D.1984).

The instructions Nos. 18 and 19 avoided the problem found in *Breece* and its progeny. Here, the instruction specifically notified the jury that any award of punitive damages was limited to the verdict director which corresponded with the specific malicious (tortious) conduct found by the jury to have occurred.

Furthermore, where the course of conduct relevant to several counts is identi-

cal or nearly identical, separate instructions on punitive damages are not required. *See Douglas v. Hoeh, supra*, at 439–440; *McKamely v. Hession*, 704 S.W.2d 701, 702–03 (Mo.App., E.D.1986). Here, the evidence concerned appellants' course of conduct relating to the operation of the franchise business and the sale of Dixie Cream, and how their activities affected or impinged on Honigmann's interests. The instructions were proper as submitted.

Appellants' final point is again an attack on the jury instructions. First, they contend that Instructions Nos. 14 and 16 erroneously omitted the term "reasonable" with regard to Honigmann's business expectancy. Secondly, they argue that these instructions fail to establish that appellants must have had knowledge as to Honigmann's business expectancy, a necessary element of the tortious interference claim.

We again note that no contemporaneous objections were made as to these instructions. *Lipton Realty, Inc. v. St. Louis Housing Auth.*, 705 S.W.2d 565, 571–72 (Mo.App., E.D.1986). Further, their second argument was not included in appellants' motion for a new trial. Rule 78.07. We review *ex gratia*.

 The expectancy theory submitted to the jury was by MAI No. 23.11, (modified) and reads as follows:

Your verdict must be for plaintiff and against defendant [ ... ] if you believe:

First, plaintiff had a business expectancy of brokering the sale of the Dixie Cream Flour Company which was terminated by the Dixie Cream Flour Company, and

Second, defendant [ ... ] caused or contributed to cause the Dixie Cream Flour Company to terminate the business expectancy of plaintiff, and

Third, defendant [ ... ] did so intentionally and without justification or excuse, and

Fourth, plaintiff was thereby damaged.

Under these instructions, the issue of the reasonableness of Honigmann's expectancy was presented to, and arguable before, the jury, and the jury was free to disbelieve that Honigmann's expectancy was reasonable and deny him punitive damages.

 The inclusion of the phrase, "intentionally and without justification or excuse," was sufficient to find that the jury understood that appellants must have had knowledge of Honigmann's interest in order to have intentionally interfered with it.

Based on the decision we reach today, the cross-appeal need not be addressed.

The judgment of the trial court is affirmed.

STEPHAN and SIMON, JJ., concur.