**Marvin MUELLER, Appellant,**

v.

**James ABDNOR, Administrator, Small Business Administration, Appellee.**

No. 91–3134.

United States Court of Appeals, Eighth Circuit.

Submitted April 17, 1992.

Decided Aug. 14, 1992.

932

James C. Owen, Chesterfield, Mo., argued, for appellant.

Claire Schenk, St. Louis, Mo., argued (Stephen B. Higgins and Claire M. Schenk, on the brief), for appellee.

Before JOHN R. GIBSON and BEAM, Circuit Judges, and MORRIS SHEPPARD ARNOLD,* District Judge.

* The HONORABLE MORRIS S. ARNOLD, United States District Judge for the Western District of Arkansas, sitting by designation. Since this case was submitted, Judge ARNOLD was appointed to the Eighth Circuit Court of Appeals.

MORRIS SHEPPARD ARNOLD, District Judge.

This is an appeal of a judgment for slander of title against Marvin Mueller as counterdefendant and in favor of James Abdnor of the Small Business Administration ("SBA"). The court reverses the judgment of the district court [1] as to damages only.

## I.

In 1977, SBA guaranteed a loan to Manco, Inc. The collateral for the SBA guarantee was two parcels of land in Miller County, Missouri, collectively known as the "Max Allen's Zoo" property. By April, 1984, the loan was in default, and SBA prepared to foreclose on its guarantee and to acquire the collateral. In June, 1985, James Hendren appraised the large parcel at $293,250 and the small parcel at $66,000. In June, 1986, Joyce Hilton appraised the large parcel at $140,297 and the small parcel at $19,400. In July, 1986, SBA foreclosed on the large parcel and listed it for sale. No takers were found at an auction in August, 1986.

Mr. Mueller had purchased SBA properties in the past. During that summer, Cornelius Weaver, an employee of SBA, had approached Marvin Mueller about buying the property. Mr. Mueller looked at both parcels, evidently believing that SBA had foreclosed on both; at the time, Mr. Weaver evidently believed that as well. In August, 1986, Mr. Mueller signed a contract for purchase on which the property was described only as "Legal Description to Govern AKA Max Allen's Zoo." The trial court found that no legal description was attached to the sale contract. The contract was signed on behalf of SBA by Darryl Westbrook, Mr. Weaver's supervisor. The trial court found that when the contract was signed, Mr. Mueller believed that it related to both parcels but that, unknown to Mr. Mueller, Mr. Westbrook believed that the contract related only to the larger parcel.

The terms of the contract called for an initial earnest money deposit of $5,000 on execution of the contract; a second earnest money deposit of $15,000 on September 9, 1986; and the balance due of $95,000 at closing, which was specified as October 10, 1986. The sale contract acknowledged receipt of the initial $5,000 deposit. (The check has disappeared; in any event, it was never cashed.) The trial court found that sometime after both parties had signed Mr. Weaver wrote on the contract that the contract was "Extended for Possession." The trial court further found that this alleged extension was neither authorized by Mr. Westbrook nor executed in accordance with SBA requirements.

The trial court found that, in September, 1986, Mr. Mueller failed to tender the additional earnest money required by the contract. His testimony was that Mr. Weaver had told him that the smaller parcel still needed to be acquired by SBA and that the second earnest money deposit did not need to be made until SBA acquired that parcel. Based on Mr. Weaver's representations that the deal was still on, Mr. Mueller expended $1,000 on upkeep in late 1986 and the first half of 1987. He paid $10,000 to SBA in December, 1986 (which was not cashed until April, 1987) and $5,000 in March, 1987. Sometime between September, 1986, and March, 1987, Mr. Westbrook told Mr. Weaver to tell Mr. Mueller that the contract had expired because of Mr. Mueller's failure to tender the additional earnest money, but Mr. Weaver did not do so until at least June or July, 1987. In June, 1987, Mr. Mueller submitted a second proposed contract for purchase of the large parcel. In July, 1987, SBA rejected that offer. In August, 1987, Mr. Mueller recorded his original sale contract with the county clerk, thus creating a cloud on the title of the SBA property.

In October, 1987, Mr. Mueller sued SBA in federal district court for breach of contract, and SBA counterclaimed for slander of title and for quiet title. A bench trial was held in November, 1989, and in May, 1991, the trial court entered its judgment.

As to the breach of contract complaint, the trial court held that no contract had

---

1. The district court's decision was published at    765 F.Supp. 551 (E.D.Mo.1991).

ever existed because of the mutual mistake of the parties as to the land being sold. The trial court further held that even if a contract had been formed, SBA had not waived its right to rescind merely because it did not immediately advise Mr. Mueller of the expiration of the contract. The trial court further found that any assurances given by Mr. Weaver to Mr. Mueller that the contract was still in force were not authorized and could not serve as the basis for an estoppel against SBA. The trial court further found that although Mr. Mueller had himself listed the property for sale and had incurred $1,000 in associated expenses, he had failed to prove lost profits to a reasonable certainty. Holding that Mr. Mueller's reliance on Mr. Weaver's assurances was reasonable, however, and that Mr. Mueller had acted to his detriment as a result of those assurances, the trial court found that Mr. Mueller was entitled to recover the $1,000 in expenses and the $15,000 he had paid to SBA.

As to SBA's counterclaim, the trial court found that Mr. Mueller knew at the time he recorded the August, 1986, contract that it had expired. The trial court found, further, that Mr. Mueller had acted with malice and had published a document that placed a cloud upon the title of the large parcel. The trial court further found that a sale by SBA of that land to a prospective buyer fell through on account of the recording of Mr. Mueller's contract, which was discovered by the prospective buyer during a title search. The trial court awarded damages of approximately $100,-000 to SBA, based on lost profits, lost interest, and expenses. Only the counterclaim is before this court.

## II.

There are five issues on appeal—whether the trial court's finding that Mr. Mueller acted with malice in recording his sale contract was inconsistent with its finding that Mr. Mueller was entitled to reimbursement for expenditures in reasonable reliance on SBA's representations; whether the trial court correctly held that the sale contract was "false"; whether the standard of proof under Missouri law for slander of title is by a preponderance of the evidence or by clear and convincing evidence; whether the trial court improperly considered hearsay regarding SBA's damages; and whether the trial court's finding of consequential damages was based on insufficient evidence.

## A.

The trial court found that Mr. Mueller had paid $1,000 in expenses on upkeep of the property in the last quarter of 1986 and the first half of 1987. The trial court also found that by May, 1987, Mr. Mueller had sent $15,000 to SBA that could not properly be applied to any other debt. All of these expenditures, the trial court held, were in reliance on Mr. Weaver's assurances that a contract still existed. Mr. Mueller's reliance was reasonable, the trial court held, in light of the "longstanding business relationship" between Mr. Mueller and Mr. Weaver.

■ Mr. Mueller argues that he could not have acted with malice, as required for slander of title,[2] if, as the trial court found, his reliance upon Mr. Weaver's assurances was reasonable. SBA argues that by late July, 1987, Mr. Mueller knew that his second proposed contract had been rejected. SBA further argues that Mr. Mueller's own testimony admits that he knew at the time he recorded his sale contract that "SBA considered it invalid" and that he did so "in order to stop" SBA's efforts to sell the property to others. Mr. Mueller replies that he had a good-faith belief that he had an interest in the property, as evidenced by the fact that SBA still had $15,000 of his money.

■ "An action for slander of title cannot exist without a malicious intent. To infer the existence of malice, the evidence

2. The elements of slander of title are: "(1) the words must be false; (2) they must be maliciously published; (3) they must result in pecuniary loss or injury to the plaintiff." *Tongay v.* *Franklin Co. Mercantile Bank,* 735 S.W.2d 766, 770 (Mo.App.1987) (citing *Butts v. Long,* 94 Mo. App. 687, 68 S.W. 754, 755 (1902)).

... must support a reasonable inference that the representation not only was without legal justification or excuse, but was not innocently or ignorantly made." *Tongay v. Franklin Co. Mercantile Bank*, 735 S.W.2d 766, 770 (Mo.App.1987) (citing *Long v. Rucker*, 166 Mo.App. 572, 149 S.W. 1051, 1054 (1912)). "Such inference may rest on a foundation of circumstantial evidence and proof of a lack of probable cause would support an inference that the representation was not innocently made out of stupidity or ignorance but was known to be false." *Id.* The court concluded that Mr. Mueller acted maliciously based on the findings (1) that he had been notified of the expiration of the contract, and (2) that his postdated check and his second offer to purchase the property had been rejected by SBA, before he presented the contract for filing to the Miller County Recorder of Deeds.[3] The trial court had the best opportunity to assess the credibility of the witnesses, including Mr. Mueller, and the trial court's findings of fact may not be disturbed unless clearly erroneous. Fed. R.Civ.P. 52(a). Upon a thorough review of the record, the court is of the view that the findings of the trial court are not clearly erroneous. Furthermore, based on the trial court's findings, the court was correct in its conclusion that Mr. Mueller's behavior was sufficient to find that he filed the contract without probable cause.

Such a conclusion is, moreover, not inconsistent with the conclusion that Mr. Mueller reasonably expended $16,000 in reliance on the representations of SBA's agent, Mr. Weaver. The timing is important here. By the middle of 1987, Mr. Mueller had spent $16,000 on the property that he thought he was buying. The expenditure seems reasonable because he then believed that he still had a deal. While Mr. Weaver's supervisor instructed him to tell Mr. Mueller that the contract had expired due to lack of payment of earnest money, Mr. Weaver did not do so until at least June or July, 1987.[4] By August, at any rate, Mr. Mueller knew that the contract had expired. Mr. Mueller filed the contract with the Recorder of Deeds on August 19, 1987. The court found that by the filing date, Mr. Mueller was aware that the contract was invalid.[5] Hence, there is no inconsistency between the conclusions that the expenditures were reasonable at the time they were made, and that the recording was malicious at the time it was recorded, because between the payments and the recording, the contract, if any contract had existed, had lost its validity.

## B.

The trial court found that because Mr. Mueller filed the sale contract in August he knew that it had expired "and was therefore false" as a slander of title. Mr. Mueller argues that nothing in the contract itself was false.[6] He goes into some detail in contending that an affirmation of his signature on the contract made by a notary public did not make the contract false, since the affirmation was merely of his signature and was not an acknowledgment that the notary had been present when the contract was executed. SBA argues that in order to be a false document under Missouri law, the contract need only have had the potential to cast doubt upon who owned the property. SBA thus contends that the contract, by being filed of record, gave the impression that Mr. Mueller had an interest in the property. Mr. Mueller replies that the contract itself was not denominated a lien, a deed of trust, or a note of any kind and that it was not evident from the face of the document that its terms had not been complied with. He further argues that the requirement in law that a document create

---

3. 765 F.Supp. at 557 (Finding of Fact # 33), and 559 (Conclusion of Law # 10).

4. *Id.* at 556 (Finding of Fact # 24) and 558 (Conclusion of Law # 6).

5. *Id.* at 559 (Conclusion of Law # 10).

6. Mr. Mueller argues that the sale contract in the real property records acted as a sort of *lis pendens* that would alert prospective buyers to the fact that the contract, or the property, was "in honest contention." He did not actually sue, however, until two months after he recorded the sale contract.

a cloud upon title goes only to the question of damages and not to its falseness.

■ "False words" are an element of slander of title.[7] Similarly, recordation of a "false" instrument states a claim for slander of title.[8] The trial court equated falsity with invalidity, and rejected Mr. Mueller's argument that because the words in the contract were not false the falsehood element was not met. The court in *Greenlake* suggested that a slander of title claim should be thought of as wrongful interference with title. "Plaintiff had a right freely to sell, transfer or incumber the property mentioned, [and] that right has been wrongfully and maliciously obstructed and interfered with by defendants' action in placing the alleged false statement on the public record." *Greenlake Investment Co. v. Swarthout,* 161 S.W.2d 697, 699 (Mo. App.1942). Here, the district court's reasoning would appear to be sound, because recording an invalid contract, when known to be invalid, has the same effect as filing a false contract. *See Sanders v. Pete & Sons Garage, Inc.,* 769 S.W.2d 844, 845 (Mo.App.1989) ("It is not a question of whether or not the [instrument] was technically effective, but whether it would have the effect of creating a cloud on the title

and would be a hindrance in the transfer of the property.").[9] The trial court did not need to find that the words in the contract itself were false, and was correct in finding that the falsity element was satisfied.

## C.

■ Mr. Mueller argues that the trial court was incorrect to use a "preponderance" standard on the slander of title claim. He contends that the correct standard is "clear and convincing." The higher standard, however, does not apply in the ordinary defamation case, but in an action brought by an individual, specifically, a public official or a public figure.[10] Traditionally used as a standard for fact finding in equity cases, this standard is also used where the cause of action is disfavored, *e.g.,* to avoid the possibility of inhibiting discussion of public figures or public issues.[11] These considerations are absent in a slander of title case, however. While there are no Missouri cases discussing with particularity the standard of proof for slander of title, the Missouri Approved Instructions ("MAI") seem to recognize that the clear and convincing standard applies only in cases involving a public figure or public official.[12] *See* MAI 3.05, 3.06. Although

7. *Euge v. Golden,* 551 S.W.2d 928, 932 (Mo.App. 1977) (plaintiff must allege "false words ... maliciously uttered which resulted in his pecuniary loss") (citing *Long v. Rucker,* 166 Mo.App. 572, 149 S.W. 1051 (1912)); *Tongay v. Franklin Co. Mercantile Bank,* 735 S.W.2d 766, 770 (Mo. App.1987) (citing *Butts v. Long,* 94 Mo.App. 687, 68 S.W. 754, 755 (1902)).

8. *Euge,* 551 S.W.2d at 932; *Greenlake Investment Co. v. Swarthout,* 161 S.W.2d 697, 699 (Mo.App.1942).

9. Mr. Mueller protests that he could not know whether the contract was invalid until the court had ruled that it was not. But *Greenlake* also suggests that liability will attach to the filing of any false or fraudulent instrument unless it is clearly apparent to an ordinary person from the face of the instrument that it is so infirm that it could not affect the title. *See* 161 S.W.2d at 669.

10. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974) (public figures may recover for injury to reputation only on clear and convincing proof); *New York Times Co. v. Sullivan,* 376 U.S. 254, 285–86, 84 S.Ct. 710, 729, 11 L.Ed.2d 686 (1964) (the constitutional standard for proving actual mal-

ice against public figure or official requires "convincing clarity"); Restatement of Torts, Second, § 580B, comment j, at 229 (1977) ("There has been no indication that proof of fault in the ordinary defamation case must meet the unusual standard of 'clear and convincing proof' that the Supreme Court has held to be required in showing knowledge or reckless disregard as to falsity in an action by a public official or a public figure.").

11. 3 Ronald D. Rotunda et al., *Treatise on Constitutional Law: Substance and Procedure* § 20.-33(c) at 168 (1986); *see Gertz,* 418 U.S. at 341, 94 S.Ct. at 3007 ("The First Amendment requires that we protect some falsehood in order to protect speech that matters.").

12. Cases from other jurisdictions merely require that the essential elements of slander of title be proved by a preponderance of evidence. *See, e.g., Fischer Bar Harbor Banking & Trust,* 673 F.Supp. 622, 625 (D.Me.1987), *aff'd,* 857 F.2d 4 (1st Cir.1988), *cert. denied,* 489 U.S. 1018, 109 S.Ct. 1135, 103 L.Ed.2d 2196 (1989); *Nolan v. Williamson Music, Inc.,* 300 F.Supp. 1311, 1320 (S.D.N.Y.1969), *aff'd sub nom. Nolan v. Sam Fox*

the named defendant/counterclaimant in this case is perhaps a public figure, this case in fact involves defamation of the ownership of land, not defamation of an individual's reputation. The trial court used the correct standard.

### D.

■ At trial, SBA put on evidence to support its claim for damages. SBA offered a contract (Exh. U) and correspondence discussing changes in the contract's terms and conditions from an attorney for a prospective buyer, Jack Jordan (Exh. W and Z). The deal with Mr. Jordan fell through when a title search revealed that Mr. Mueller's contract had been recorded. SBA also offered a contract between it and the person who eventually bought the property in order to show the difference between the amount offered by the original prospect and the amount received when the property was finally sold (Exh. BBB). To show part of its transaction expenses for the actual sale, SBA also offered an auction contract (Exh. EEE). At trial, Mr. Mueller challenged the admission of the contracts and the two letters from Mr. Jordan's attorney, objecting that they were hearsay (T. 202–03, 207, 211–12, and 362). SBA defended the contracts and letters as business records under Fed.R.Evid. 803(6).

■ The hearsay rule excludes out-of-court assertions used to prove the truth of the facts asserted in them. Verbal acts, however, are not hearsay because they are not assertions and not adduced to prove the truth of the matter. *See* 2 John W. Strong et al., *McCormick on Evidence*, § 249 at 101 (4th ed. 1992); 6 John H. Wigmore, *Evidence* § 1770 at 259 (James H. Chadbourn rev. ed. 1976). The Federal Rules of Evidence "exclude from hearsay the entire category of 'verbal acts' and 'verbal parts

of an act,' in which the statement itself affects the legal rights of the parties or is a circumstance bearing on conduct affecting their rights." Fed.R.Evid. 801(c) advisory committee's note. A contract, for example, is a form of verbal act to which the law attaches duties and liabilities and therefore is not hearsay. *See* 2 *McCormick on Evidence*, § 249 at 101. In particular, evidence of lost profits based on a contract is not subject to the hearsay rule because such evidence concerns the existence of the contractual terms rather than an assertion of their "truth." *See* 6 Wigmore, *Evidence* § 1770 at 259–60 n. 1 (setting forth the text of *United States Fidelity and Guaranty Co. v. Davis*, 3 Ariz.App. 259, 261, 413 P.2d 590, 592 (1966)). In addition, various communications—*e.g.*, conversations, letters, and telegrams—relevant to the making of the contract are also not hearsay. *See id.* at 259, 413 P.2d at 590. The contracts and the letters from Jordan's attorney were therefore not hearsay when they are offered to show the making of the contract and the potential loss of benefit to SBA.

### E.

In his brief, Mr. Mueller makes an oblique reference to the sufficiency of the evidence of damages due to the loss of the Jordan contract. At oral argument, defendant very briefly argued that because a financing contingency existed in the Jordan contract, *see* Exhs. W and X, and because SBA did not prove that Jordan in fact had financing, SBA failed to prove that the Jordan contract was a fully valid contract. The agreement could not therefore, the argument runs, support a finding of damages. Mr. Mueller provides no law on this point, other than asserting that SBA failed to sustain its burden as to damages.[13] The court found that on August 27, 1987, SBA

---

*Pub. Co.,* 499 F.2d 1394 (2d Cir.1974); *Henderson v. Millis,* 373 N.W.2d 497, 506 (Iowa 1985); *Clark v. Lewis,* 684 S.W.2d 161, 164 (Tex. App.1984); *Howarth v. Ostergaard,* 30 Utah 2d 183, 185, 515 P.2d 442, 444 (Utah 1973); *see generally* 50 Am.Jur.2d *Libel and Slander* § 556 at 1073 (1970).

**13.** This particular issue was not adequately briefed, and thus arguably need not even be

considered by the court. *See Jasperson v. Purolator Courier Corp.,* 765 F.2d 736, 740–41 (8th Cir.1985). Mr. Mueller preserved this issue at trial when he objected to Westbrook's testimony regarding losses based on the Jordan contract, arguing that SBA failed to show that Jordan was ready, willing, and able to perform. T. 207. On appeal Mr. Mueller alludes to this argument, but neither emphasizes it nor supports it with any

entered into a contract with Jordan to sell the property for $238,000; the court also found that the contract failed to close because of the filing of the Mueller contract with the Recorder of Deeds.[14] On the basis of these findings, the court concluded that SBA established its pecuniary loss.[15]

There are no Missouri slander of title cases that bear on this aspect of the law of damages, but tortious interference with contract is similar to slander of title, and cases of this latter sort offer relevant guidance.[16] Any damages, whether based on a contract or expectancy,[17] must be proved with reasonable certainty, and, if the Jordan contract was ill-fated even absent interference, SBA would not have sustained damages, or would have sustained them in some different amount. Liability under a tortious interference theory cannot be predicated upon speculation, conjecture, or guesswork, and no fact essential to submissibility can be inferred absent a substantial evidentiary basis. *A.L. Huber v. Jim Robertson Plumbing, Inc.,* 760 S.W.2d 496, 499 (Mo.App.1988). Such a rule prevents plaintiff from obtaining a windfall from a contract that might never have been performed even if the defendant had done nothing wrong. *Technology For Energy Corp. v. Scandpower, A/S,* 880 F.2d 875, 877 (6th Cir.1989), *cert. denied,* 493 U.S. 1057, 110 S.Ct. 868, 107 L.Ed.2d 952 (1990).

In Missouri, courts apply essentially a "but-for" test of causation. A defendant must respond in damages if "the party defaulting was ready, able, and willing to perform and would have done so if it had not been prevented or persuaded by the malicious and unwarranted interference of a third party." *Tri–Continental Leasing Co. v. Neidhardt,* 540 S.W.2d 210, 216 (Mo.App.1976) (quoting *United States v. Newbury Mfg. Co.,* 36 F.Supp. 602, 605 (D.Mass.1941)). Under *Tri–Continental,* Missouri courts ask two questions: (1) did plaintiffs actively and affirmatively take steps to induce the breach; and if so, (2) would the contracts have been performed absent plaintiffs' interference? In that case, the plaintiff's claim failed the but-for test because the evidence showed that defendant had decided to breach the contract anyway, and the interference could not be characterized as a but-for cause. 540 S.W.2d at 216.

It is manifestly unjust to find damages speculative where the wrong complained of itself makes them speculative. In *Mills v. Murray,* 472 S.W.2d 6 (Mo.App. 1971), the defendants contended that the award for actual damages was speculative because the award was based on the assumption that the clients that defendants serviced for plaintiff would have remained with plaintiff after defendants' departure. Defendants argued that these clients would have switched to defendants when defendants left plaintiff's employ, irrespective of any wrongdoing. The court rejected this argument: "But if that be so, it is only because of defendants' wrong that the damages cannot be determined with more certainty and defendants will not be heard to say, on that account, that plaintiffs may

law. In fact, he seems to use this observation merely to bolster his argument that Mr. Jordan's signature is hearsay. *See* Mueller Br. at 31 ("It cannot be assumed that the signature was that of an actual person or that such a person stood ready, willing and able to purchase the property").

14. 765 F.Supp. at 557 (Findings of Fact ## 35 and 36).

15. *Id.* at 559 (Conclusion of Law # 11).

16. In Missouri, the essential elements for a tortious interference claim are: (1) a contract or valid business relationship or expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference in inducing or causing breach of the contract or expect-

ancy; (4) absence of justification; and (5) resulting damages. *A.L. Huber v. Jim Robertson Plumbing, Inc.,* 760 S.W.2d 496, 499 (Mo.App. 1988); *American Bank of Princeton v. Stiles,* 731 S.W.2d 332, 343 (Mo.App.1987); *Community Title Co. v. Roosevelt Federal S & L Ass'n,* 670 S.W.2d 895, 904–05 (Mo.App.1984). These elements must be proved by "substantial evidence." *Honigman v. Hunter Group, Inc.,* 733 S.W.2d 799 (Mo.App.1987).

17. In this case, SBA's damages consist of an expectancy based on the Jordan contract, but an expectancy which failed to materialize because of Mr. Mueller's slander. Missouri cases on tortious interference with contract do not require a contract, merely an expectancy. *See Cook v. MFA Livestock Ass'n,* 700 S.W.2d 526, 529 (Mo.App.1985).

not have full relief for the injury defendants inflicted on them." *Id.* at 16–17.

Does the evidence in our record indicate that but for Mr. Mueller's interference the Jordan contract would have been performed? The only event (other than Mr. Mueller's tortious interference) that stood in the way of consummating the sale was the financing. The Jordan contract is evidence that the parties were at least ready and willing, if not able, to consummate the transaction. The financing was the single event potentially precluding the sale. We must consider, therefore, whether the financing question renders the transaction (and thus the damages) not reasonably certain, or whether certainty cannot be determined due to the actions of Mr. Mueller.

In our case, it is of course entirely possible that Mr. Mueller's actions discouraged Mr. Jordan from seeking financing. In that event, Mr. Mueller's tort would have been the event that caused the damages to be speculative. But there is nothing in this record from which the trial court could conclude that Mr. Mueller's actions provided such a disincentive to the prospective purchaser that he abandoned the search for a loan. There is, it is true, a letter in evidence to the effect that Mr. Jordan discontinued his effort to obtain financing because Mr. Mueller filed his contract; but this statement is hearsay and was objected to as such.[18]

In these circumstances, we are unable to say that the plaintiff made out a submissible case on Mr. Jordan's ability to perform his contract, an essential element of SBA's case. The trial court cannot presume a purchaser's ability to perform, nor could the court infer ability from any of the

circumstances proved in the case. The damage award therefore cannot stand.

### III.

In conclusion, for the foregoing reasons, the judgment of the district court is reversed as to damages only. It is affirmed in every other respect.

JOHN R. GIBSON, Circuit Judge, dissenting.

I respectfully dissent. I would affirm on the basis that the sufficiency of the evidence to support damages has not been squarely placed before us and I would not reach the issue.

---

18. Even though the Small Business Administration might lend money pursuant to the contract executed by Jack Jordan, it is quite possible that Mr. Jordan might have to pay the SBA without having the land because of the [Mueller] contract. Thus, we feel that until the contract with Mr. Mueller can be resolved, Mr. Jordan can take no further steps toward the purchase of this property.

Exh. Z (letter from William F. Washburn, Esq. to Darrell W. Westbrook, dated October 5, 1987). This letter was properly admitted as part of the negotiations of the contract, but is hearsay when considered as proof of why Mr. Jordan felt he could not go through with the transaction, for it is thus considered for the truth of the matter asserted, not as a verbal act. The above-quoted portion of this letter is merely a statement lacking the guarantees of trustworthiness generally associated with the various exceptions to the hearsay rule, *United States v. Moore,* 748 F.2d 246, 248 (5th Cir.1984), and mere receipt and possession of a letter does not inoculate assertions contained therein from the hearsay rule under the business records exception, Fed.R.Evid. 803(6).