In re CENTURY CITY DOCTORS HOSPITAL, LLC, Debtor.

Richard K. Diamond Chapter 7 Trustee, Plaintiff,

v.

Robert Friedman, Defendant.

Bankruptcy No. 2:08–bk–23318–PC.
Adversary No. 2:10–ap–02401–PC.

United States Bankruptcy Court,
C.D. California,
Los Angeles Division.

Jan. 24, 2012.

**4**

Howard Kollitz, Esq., Enid M. Colson, Esq., Kevin D. Meek, Esq., Danning, Gill, Diamond & Kollitz LLP, Los Angeles, CA, for Plaintiff, Richard K. Diamond, Chapter 7 Trustee.

Louis E. Kempinsky, Esq., Howard J. Weg, Esq., John C. Keith, Esq., Peitzman Weg & Kempinsky LLP, Los Angeles, CA, for Defendant, Robert Friedman.

### MEMORANDUM DECISION

PETER H. CARROLL, Chief Judge.

This matter comes before the court on a motion by defendant Robert Friedman ("Friedman") for summary judgment or, in the alternative, summary adjudication of each claim of plaintiff Richard K. Diamond ("Diamond"), the chapter 7 trustee. The court, having considered the pleadings, evidentiary record, and arguments of counsel, makes the following findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a)(1),[1] as incorporated into FRBP 7052 and applied to adversary proceedings in bankruptcy cases.

### I. *STATEMENT OF FACTS*

In 2004, Friedman learned that Century City Doctors Hospital, L.P. ("CCDH") was offering limited partnership interests in CCDH ("Units") at $40,000 per Unit. Mark Bidner ("Bidner"), whom Friedman knew personally and professionally, was then the

---

1. Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 after its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. 109–8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("F.R.Civ.P."). "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR").

President of Salus Surgical Group, LLC ("Salus"), the general partner of CCDH.[2] Friedman inquired about investing in CCDH.

In response to Friedman's inquiry, Bidner sent Friedman a letter dated August 7, 2004 ("2004 Letter"). The 2004 Letter was accompanied by certain documents, including: (1) an Amended and Restated Limited Partnership Agreement of the Century City Doctors Hospital, L.P., dated August 6, 2004 ("LP Agreement"); and (2) an Updated Confidential Private Placement Memorandum of Century City Doctors Hospital, L.P., dated August 6, 2004 ("Private Placement Memo").

Although Friedman was interested in investing in CCDH, he had reservations about making a substantial investment in a new hospital project that might not succeed without Bidner's leadership. To address this concern, Bidner, in his capacity as President of Salus, made the following oral representation: if Bidner ceased to maintain an active, full-time role in managing the hospital project, Friedman would have a right to withdraw from the partnership and receive a refund of his investment in return for relinquishing his limited partnership interest ("Withdrawal Agreement").[3]

In August 2004, Friedman signed a joinder to the LP Agreement and purchased $450,000 in CCDH Units at $40,000 per Unit ("Investment"), which constituted a 1.2797033% limited partnership interest in CCDH ("LP Interest").[4] In December 2004, Bidner resigned as President of Salus. Shortly before resigning, Bidner contacted CCDH investors, including Friedman, to disclose his impending resignation.

Once he learned of Bidner's imminent departure, Friedman exercised his right to withdraw under the Withdrawal Agreement. Subsequently, Friedman received a letter from Kerri Nickerson of CCDH, dated January 19, 2005 ("Refund Letter"), which was accompanied by a check, dated January 18, 2005, from CCDH and made payable to Friedman in the amount of

---

2. The court overrules Friedman's objection to Plaintiff's 1st Set of Request for Judicial Notice in Support of Plaintiff's Opposition to Defendant's Notice of Motion and Motion for Summary Judgment or in the Alternative Summary Adjudication of Each of the Plaintiff's Claims. Diamond has filed evidentiary objections to the Declaration of Robert Friedman in Support of Defendant's Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Each of Plaintiff's Claims ("Friedman Decl.") and to the Declaration of Mark Bidner in Support of Defendant's Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Each of Plaintiff's Claims ("Bidner Decl."). The court overrules these objections and will specifically address certain hearsay objections and parol evidence objections in footnotes 3 and 39, respectively.

3. Friedman Decl. 2:1–4. Friedman's testimony regarding the Withdrawal Agreement is corroborated by Bidner's testimony. *Compare* Friedman Decl. ¶¶ 2–9, *with* Bidner Decl.

¶¶ 1–10. Diamond objects to testimony concerning the Withdrawal Agreement on hearsay grounds. Testimony offered for a purpose other than to prove its truth is nonhearsay. *See, e.g., Ortiz v. United States,* 318 F.2d 450, 451 (9th Cir.1963). Verbal acts (e.g., statements of independent legal significance) are admissible nonhearsay to prove the words were spoken or the act was done. Fed. R.Evid. 801(c) advisory committee's notes; *see also N.L.R.B. v. H. Koch & Sons,* 578 F.2d 1287, 1290–91 (9th Cir.1978); *Mueller v. Abdnor,* 972 F.2d 931, 937 (8th Cir.1992). Testimony regarding the Withdrawal Agreement is not offered by Friedman for the truth of any matter asserted, but solely for the purpose of showing that the making of the agreement and the agreement terms were material inducements to Friedman to invest in CCDH. As such, the court considers the testimony admissible as verbal acts of the contracting parties and overrules Diamond's hearsay objections to the admissibility of such testimony.

4. Friedman Decl. Exs. D–F.

$450,000 ("Transfer").[5] The Refund Letter reads in part: "Dear Mr. Friedman, Please find enclosed a check in the amount of $450,000 *refunding your investment in Century City Doctors Hospital* per your request."[6] On March 3, 2008, CCDH converted from a limited partnership to a limited liability company.

On August 22, 2008—more than three and half years after the Transfer was made—CCDH filed a petition for relief under chapter 7 of the Code and Diamond was appointed as trustee in the case. On July 30, 2010, Diamond commenced this adversary proceeding against Friedman seeking to avoid and recover the Transfer. On August 13, 2010, Diamond filed a First Amended Complaint to Avoid and Recover Value of Fraudulent Transfer; Turnover; Unjust Enrichment; and for Unlawful Distribution ("Complaint") stating, in pertinent part:

> Plaintiff is informed and believes and, based thereon, alleges, that the Debtor made a transfer to [Friedman] totaling no less than $450,000.00 including, but not limited to, the transfer identified in Exhibit "1" attached hereto and incorporated herein by this reference (the "Subject Transfer").[7]

Exhibit "1" to Diamond's Complaint identifies Friedman and lists the following information:

| | | | | |
|---|---|---|---|---|
| 704 | 01/18/05 | 01/24/05 | 450,000 | 450,000 |
| | | | | 0.00 450,000 [8] |

Diamond does not allege in his Complaint any other facts regarding the Transfer,

but claims that the Transfer is avoidable for one or more of the following reasons:

1. CCDH allegedly "made the Subject Transfer [to Friedman] with the actual intent to hinder, delay, or defraud one or more of its creditors."[9]

2. CCDH allegedly "received less than reasonably equivalent value in exchange for such transfer or obligation," and "at the time the Subject Transfer was made, [CCDH] was either insolvent or became insolvent as a result of the Subject Transfer."[10]

3. CCDH, at the time of the Subject Transfer, allegedly "was engaged, or was about to engage, in business or a transaction or transactions for which their remaining assets were unreasonably small capital."[11]

4. CCDH allegedly "intended to incur, or believed or reasonably should have believed, that it would incur debts that would be beyond the ability to pay as such debts matured."[12]

Diamond also demands a turnover of the Transfer,[13] asserts that Friedman "received a benefit and unjustly retained that benefit at the expense of [CCDH], unsecured creditors, and each of them,"[14] and claims that the Transfer was "an unlawful distribution under 6 Del. C. § 17–607(b), Cal. Corp.Code § 15905.08(b), Cal. Corp. Code § 15905.09, and other applicable law."[15] Friedman filed his answer to Diamond's Complaint on February 15, 2011.

---

5. Friedman Decl. Ex. I.

6. *Id.* Ex. H (emphasis added).

7. Compl. 2:22–25.

8. *Id.* Ex. "1."

9. *Id.* 3:7–8 (First Claim for Relief).

10. *Id.* 3:20–24 (Second Claim for Relief).

11. *Id.* 4:8–10 (Third Claim for Relief).

12. *Id.* 4:22–24 (Fourth Claim for Relief).

13. *Id.* 5:10–11 (Fifth Claim for Relief).

14. *Id.* 5:17–19 (Sixth Claim for Relief).

15. *Id.* 5:25–26 (Seventh Claim for Relief).

By this motion, Friedman seeks summary judgment as to all of Diamond's claims. Friedman argues, among other things, that all of Diamond's claims are time-barred under applicable Delaware law. Diamond disagrees, arguing that the court should not apply Delaware law; or alternatively, that to the extent the court looks to Delaware law, the statute upon which Friedman relies is not applicable to the facts of this case.

## II. DISCUSSION

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), (H) and (O). Venue is appropriate in this court. 28 U.S.C. § 1409(a).

### A. *Summary Judgment*

Rule 56(a) authorizes a party to "move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." F.R.Civ.P. 56(a). Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* In determining whether a genuine factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.... If the evidence is merely colorable, ... or is not significantly probative, ... summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505. However, the court's function on a motion for summary judgment is "issue-finding, not issue-resolution." *United States v. One Tintoretto Painting Entitled "The Holy Family with Saint Catherine and Honored Donor"*, 691 F.2d 603, 606 (2d Cir.1982). Rule 56 does not permit "trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are [fact finder] functions...." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

When the nonmoving party has the burden of proof at trial, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir.2000) (stating that the *Celotex* showing can be made by "pointing out through argument-the absence of evidence to support plaintiff's claim"). "Once the moving party carries its initial burden, the adverse party 'may not rest upon the mere allegations or denials of the adverse party's pleading,' but must provide affidavits or other sources of evidence that 'set forth specific facts showing that there is a genuine issue for trial.'" *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.2001) (quoting former F.R.Civ.P. 56(e)); *see Celotex*, 477 U.S. at 323–24, 106 S.Ct. 2548. If the nonmoving party fails to establish a triable issue "on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

### B. *Fraudulent Transfer Claim under § 544(b)*

 Section 544(b) of the Code provides that a chapter 7 trustee may avoid transfers or obligations that could have been avoided by an unsecured creditor un-

der nonbankruptcy law had the bankruptcy case not been filed, provided such a creditor actually exists. 11 U.S.C. § 544(b); *Barclay v. Mackenzie (In re AFI Holding, Inc.)*, 525 F.3d 700, 703 (9th Cir.2008). Applicable state law defenses may be invoked by a defendant in a § 544(b) action, which defenses may reduce or even eliminate the amount recoverable under § 544(b). *See, e.g., Decker v. Tramiel (In re JTS Corp.)*, 617 F.3d 1102, 1120 (9th Cir.2010).

Using § 544(b), Diamond asserts causes of action under California's Uniform Fraudulent Transfer Act ("CUFTA"). Under CUFTA, a creditor may avoid a transfer that is actually or constructively fraudulent within four years of the transfer. Cal. Civ.Code §§ 3439.04(a)-(b), 3439.05. The Transfer was made on January 18, 2005, approximately three and half years prior to the petition date. The filing of the bankruptcy tolls certain nonbankruptcy statutes of limitations—including the claims asserted under CUFTA—by two years. 11 U.S.C. § 108(a). Diamond filed this adversary proceeding on July 30, 2010, within two years after the petition date, which means that Diamond's CUFTA claims are timely.

Friedman contends that Diamond cannot assert claims under California law because the LP Agreement contains a choice-of-law provision requiring the application of Delaware law for disputes arising from or concerning the LP Agreement. Friedman believes that, to the extent Diamond seeks to assert applicable nonbankruptcy claims under § 544(b), Diamond must do so under Delaware law.

Similar to California, Delaware has adopted the Uniform Fraudulent Transfer Act ("DUFTA"). 6 Del. C. § 1301 et seq. The statute of limitations for bringing a fraudulent transfer claim under DUFTA is also four years. 6 Del. C. § 1309. Thus, a fraudulent transfer claim under DUFTA would also be timely. Viewed from this perspective, there is little difference—either substantively or procedurally—if the court were to apply Delaware law over California law. *See, e.g., Mervyn's LLC v. Lubert–Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 496 n. 6 (Bankr.D.Del.2010) (noting that Delaware, California, and Minnesota "have similarly adopted the [Uniform Fraudulent Transfer Act], and therefore the result [of choosing one state law over another] is the same regardless of the choice of law issue"); *Zahn v. Yucaipa Capital Fund*, 218 B.R. 656, 666 (Bankr.D.R.I.1998) ("[I]f there is no conflict between the two states' laws, then the Court need not engage in a choice-of-law analysis.").

Friedman's choice of law argument, however, does not end with DUFTA. Friedman seeks to invoke § 17–607(c) of the Delaware Revised Uniform Limited Partnership Act ("DRULPA"). 6 Del. C. § 17–101 et seq. Section 17–607(c) of DRULPA is a statute of repose. Friedman asserts that Delaware law is applicable because the CCDH limited partnership was organized under Delaware law, and that § 17–607(c)effectively bars all of Diamond's claims against him. To resolve this matter, the court must determine (1) whether it should apply Delaware law to this case; and (2) if so, whether § 17–607(c) of DRULPA, in fact, bars the causes of action set forth in Diamond's Complaint.

### 1. *Choice–of–Law*

The LP Agreement contains an explicit choice-of-law provision, which states: "This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the

laws of the State of Delaware."[16] Friedman contends that, under this choice-of-law provision and applicable California law concerning limited partnerships, Delaware law governs all nonbankruptcy law aspects of this adversary proceeding, including nonbankruptcy law fraudulent transfer claims under § 544(b). Diamond, on the other hand, argues that the court should disregard the explicit choice-of-law provision in the LP Agreement for two reasons. First, fraudulent transfer claims "sound in tort" and therefore, are not governed by contractual choice-of-law provisions. Second, the Transfer does not "arise" under the LP Agreement, so Delaware law is inapplicable.

### a. Diamond's Fraudulent Transfer Claims Do Not "Sound in Tort"

■ Diamond asserts that "fraudulent transfer actions are not actions based on contracts and are not governed by the choice of law provisions within a contract."[17] Rather, such claims "sound in tort."[18] And under applicable federal common law choice-of-law rules concerning claims that "sound in tort," the court must apply California law to the proceedings. Diamond supports his argument with nonbinding authority.[19] Controlling case law, however, compels a different conclusion.

The Supreme Court recently reiterated that fraudulent transfer actions in bankruptcy are "quintessentially suits at common law that *more nearly resemble state law contract claims* brought by a bankrupt corporation to augment the bankruptcy estate...." *Stern v. Marshall*, —— U.S. ——, 131 S.Ct. 2594, 2614, 180 L.Ed.2d 475 (2011) (emphasis added) (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989)). More to the point, the Ninth Circuit has held that "a cause of action to recover fraudulent conveyances" is "an action *not* founded upon a tort" for purposes of determining the applicable statute of limitations under 28 U.S.C. § 2415. *United States. v. Neidorf*, 522 F.2d 916, 917–18 (9th Cir. 1975) (emphasis added), *cert. denied*, 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976). Courts in other districts have held similarly. *See, e.g., Desmond v. Moffie*, 375 F.2d 742, 743 (1st Cir.1967) (finding a fraudulent conveyance claim under Massachusetts Uniform Fraudulent Conveyance Law not to be a tort for purposes of choosing appropriate statute of limitations); *Branch v. F.D.I.C.*, 825 F.Supp. 384, 419–20 (D.Mass.1993) (finding a fraudulent conveyance claim not to be a tort claim for purposes of the Federal Tort Claims Act); *F.D.I.C. v. Martinez Almodovar*, 671 F.Supp. 851, 871 (D.P.R.1987) (holding that the applicable statute of limitations in fraudulent conveyance action brought by F.D.I.C. was a six-year term for contract actions, rather than a three-year term applicable to actions for money damages founded upon a tort). Because a

---

16. Friedman Decl. Ex. B, LP Agreement § 22.3.

17. Plaintiff's Opposition to Defendant's Motion for Summary Judgment or, in the Alternative, Summary Adjudication of Each of the Plaintiff's Claims ("Opp'n") 7:17–20.

18. *Id.* 8:8.

19. *See In re Consol. Capital Equities Corp.*, 143 B.R. 80, 84 (Bankr.N.D.Tex.1992) (citing *Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.)*, 108 B.R. 384, 386–87 (Bankr.D.Mass.1989)); *Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*, 126 B.R. 370, 390–91 (Bankr.D.Mass.1991); *Schlumberger Logelco Inc. v. Morgan Equip. Co.*, 1996 WL 251951, *2 (N.D.Cal.1996); *see also Tow v. Rafizadeh (In re Cyrus II P'Ship)*, 413 B.R. 609, 619 (Bankr.S.D.Tex.2008) ("avoidance actions under § 544(b) are appropriately characterized as tort actions" and are actions that "sound in tort").

fraudulent transfer claim in bankruptcy is not one based in tort, and the Ninth Circuit has declined to characterize such a claim as a tort for statute of limitations purposes, this court will not consider a fraudulent transfer claim as "sounding in tort" in its choice-of-law analysis.

### b. *The Transfer "Arises" under the LP Agreement*

■ Diamond's second argument for not applying Delaware law is more tenuous than his first. Diamond repeatedly asserts that the Transfer to Friedman was a breach of the LP Agreement[20] and contrary to the terms of the Private Placement Memo.[21] Diamond refers to the Withdrawal Agreement as an alleged agreement that is neither valid nor enforceable.[22] Diamond argues that the court should not apply Delaware law because the Transfer—which Diamond contends was impermissible under both the LP Agreement and the Withdrawal Agreement—does not "arise" under LP Agreement.[23]

Diamond's reasoning is perplexing. On the one hand, Diamond asks the court to look at the LP Agreement and various other documents surrounding the purchase of the Units to determine that the Transfer was actually and constructively fraudulent; on the other, Diamond wants the

court to treat the Transfer itself as an independent transaction not "arising" under the LP Agreement. To do as Diamond suggests, the court must read the LP Agreement selectively—giving credence to certain sections of the LP Agreement that favor Diamond's case while completely ignoring its other material provisions, such as Article I of LP Agreement. The court declines to do so. *See Porter v. Pathfinder Servs., Inc.*, 683 A.2d 40, 42 (Del.1996) (a "contract must be construed in its context as a whole"); *E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del.1985) ("a court must construe the agreement as a whole, giving effect to all provisions therein").

Article I specifically states that *"[t]he rights and liabilities of the Partners shall be as provided in the Partnership Act, except as otherwise expressly provided for in this Agreement."*[24] The LP Agreement defines the "Partnership Act" as "the Delaware Revised Uniform Limited Partnership Act [DRULPA], as forth in the Delaware Code Annotated, Title 6, Chapter 17."[25] DRULPA contains numerous provisions concerning both permissible and impermissible distributions and withdrawals, which provisions govern parties' rights and liabilities *in the absence* of express

---

**20.** Opp'n 1:15–18 ("[Friedman] had no right to withdraw, and in fact was precluded from withdrawing under ... the various documents comprising the offering regarding the sale and purchase of [Friedman's] limited partnership interest"); id. 2:9–10 ("one searches CCDH's limited partnership agreement in vain to find a provision that allows withdrawal").

**21.** *Id.* 2:13–24.

**22.** *See id.* 2:4–5 (The Withdrawal Agreement "did not and could not constitute an agreement with or by CCDH, at least one in accordance with applicable law.")

**23.** *Id.* 11:17–12:1 ("[T]he [T]ransfer did not arise under the CCDH LP Agreement, but in respect of the [Withdrawal] Agreement with Bidner. In fact, ..., the CCDH LP Agreement neither contemplates nor allows a withdrawal and refund. And *in the absence* of such provisions, such withdrawal and refund are contrary to both Delaware and California law.") (emphasis added).

**24.** Friedman Decl. Ex. B, LP Agreement Art. I (emphasis added).

**25.** *Id.*, LP Agreement, Definitions.

terms concerning the same. *See* 6 Del. C. § 17–601 et seq.; *Elf Atochem North Am., Inc. v. Jaffari,* 727 A.2d 286, 291 (Del.1999) (noting that DRULPA's "basic approach is to permit partners to have the broadest possible discretion in drafting their partnership agreements and *to furnish answers only in situations where the partners have not expressly made provisions in their partnership agreement* ") (emphasis added) (quoting another source).

Friedman reviewed the LP Agreement prior to investing $450,000 in CCDH. He purchased $450,000 in CCDH Units in reliance on the LP Agreement, and owned a 1.2797033% limited partnership interest in CCDH for a period of five months pursuant to the LP Agreement. Friedman withdrew as a limited partner and received a refund of his $450,000 investment. Because the LP Agreement does not contain express terms governing the refund of an investment upon the withdrawal of a limited partner, the court must look to DRULPA as directed by Article 1 of the LP Agreement to determine if such a distribution was authorized by law. The court's conclusion is bolstered by its own analysis of federal choice-of-law rules.

c. *Delaware Law Governs the LP Agreement under Federal Choice-of-Law Rules*

██▌ "In federal question cases with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice of law rules." *Lindsay v. Beneficial Reinsurance Co. (In re Lindsay),* 59 F.3d 942, 948 (9th Cir. 1995) (citations omitted). Federal common law follows the approach of the Restatement (Second) of Conflict of Laws ("Restatement"). *Chuidian v. Philippine Nat. Bank,* 976 F.2d 561, 564 (9th Cir.1992). Two sections of the Restatement are relevant to the court's analysis: § 6(1), which provides general choice-of-law principles, and § 187, which concerns contractual choice-of-law provisions. *In re Gibson,* 234 B.R. 776, 779 (Bankr.N.D.Cal.1999).[26] Section 6(1) of the Restatement states: "A court, subject to constitutional restrictions, will follow a statutory directive of *its own state on choice of law.*" Restatement § 6(1) (emphasis added). Section 15909.01(a)[27] of the California Corporations Code provides:

> The laws of the state or other jurisdiction *under which a foreign limited partnership is organized* govern relations among the partners of the foreign limited partnership and between the partners and the foreign limited partnership and the liability of partners as partners for an obligation of the foreign limited partnership....

Cal. Corp.Code. § 15909.01(a) (emphasis added). Section 187(1)[28] of the Restate-

---

**26.** Diamond contends that the court should apply § 145 of the Restatement in this matter. Opp'n 8:8–9. Section 145 concerns the rights and liabilities of parties with respect to issues in tort and requires courts to apply the "the local law of the state which ... has the most significant relationship to the occurrence [of the tort] and the parties." Restatement § 145(1). Diamond spends a portion of his opposition discussing the "significant relationship" between California, the Transfer, and the parties. *See id.* 8:10–11:10. Fraudulent transfer claims are not torts nor do they sound in tort. Accordingly, Restatement § 145 is inapplicable to the facts of this case.

**27.** In 2006, California enacted the Uniform Limited Partnership Act of 2008 ("2008 Act"). *See* Cal. Corp.Code § 15900 et seq. The 2008 Act went into effect on January 1, 2008. *See* Stats. 2006, c. 495, § 20. As of January 1, 2010, all partnerships are governed by the 2008 Act, subject to a few exceptions that are not applicable here. *See* Cal. Corp.Code § 15912.06(b).

**28.** California also follows the Restatement when considering the enforceability of contractual choice-of-law clauses. *See Nedlloyd Lines B.V. v. Superior Court,* 3 Cal.4th 459, 464–65, 11 Cal.Rptr.2d 330, 834 P.2d 1148

ment further states: "The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." Restatement § 187(1); *see also CMR Mortg. Fund, LLC v. Canpartners Realty Holding Co. IV LLC (In re CMR Mortg. Fund, LLC)*, 416 B.R. 720, 729 (Bankr.N.D.Cal.2009) ("Where ... the making of a contract is not in dispute, the law chosen by the parties need not have any reasonable relationship to the place of creation or performance of the contract.")

California law specifically directs that foreign limited partnerships [29] be governed by the laws under which they are organized. The LP Agreement was organized under Delaware law [30] and the contracting parties explicitly agreed that their respective rights and liabilities "be governed by and interpreted in accordance with the laws of the State of Delaware." [31] Accordingly, the court will apply Delaware law to the extent that it is applicable.

2. *Statutes of Limitations and Statutes of Repose*

▮ Delaware recognizes that statutes of limitations and statutes of repose are two distinct legal concepts. *Cheswold Volunteer Fire Co. v. Lambertson Constr. Co.*, 489 A.2d 413, 421 (Del.1984). "While the running of a statute of limitations will nullify a party's remedy, the running of a statute of repose will extinguish *both the remedy and the right.*" *Id.* (emphasis

added). And while a statute of limitations is a "procedural mechanism," a statute of repose is a "substantive provision" in that it "bar[s] a right of action even before the injury has occurred if the injury occurs subsequent to the prescribed time period." *Id.* (internal citation and quotations omitted). "Moreover, because the statute of repose is a substantive provision, it relates to the jurisdiction of the court; hence 'any failure to commence the action within the applicable time period extinguishes the right itself and divests the ... court of any subject matter jurisdiction which it might otherwise have.'" *Id.* (quoting *First Sav. & Loan Ass'n v. First Fed. Sav. & Loan Ass'n of Haw.*, 547 F.Supp. 988, 995 (D.Haw.1982)).

▮ Section 17–607 of DRULPA concerns limitations on partnership distributions. 6 Del. C. § 17–607(a)–(c). Section 17–607(a) provides that a limited partnership cannot make a distribution to a partner if it would cause the liabilities of the partnership to exceed its assets. 6 Del. C. § 17–607(a); *Freeman v. Williamson*, 383 Ill.App.3d 933, 937, 322 Ill.Dec. 208, 890 N.E.2d 1127, 1132 (2008). Section 17–607(b) provides that "[a] limited partner who receives a distribution in violation of [§ 17–607(a)], and who knew at the time of the distribution that the distribution violated [§ 17–607(a)], shall be liable to the limited partnership for the amount of the distribution." 6 Del. C. § 17–607(b).

Section 17–607(c) of DRULPA states: "Unless otherwise agreed, a limited part-

---

(1992) ("In determining the enforceability of arm's-length contractual choice-of-law provisions, California courts shall apply the principles set forth in Restatement section 187, which reflects a strong policy favoring enforcement of such provisions.").

29. "Foreign limited partnership" is defined as "a partnership formed under the laws of a jurisdiction other than [California] and re-

quired by those laws to have one or more general partners and one or more limited partners." Cal. Corp.Code § 15901.02(k).

30. Friedman Decl. Ex. B, LP Agreement Art. 1.

31. *Id.*, LP Agreement § 22.3.

ner who receives a distribution from a limited partnership shall have no liability *under this chapter or other applicable law* for the amount of the distribution after the expiration of 3 years from the date of the distribution." 6 Del. C. § 17–607(c) (emphasis added). "Section 17–607(c) is unambiguous: a limited partner is not liable for any distribution received from a limited partnership, regardless of whether that distribution violated section 17–607(a) or 'other applicable law,' if more than three years have passed since the distribution." *Freeman,* 383 Ill.App.3d at 937, 322 Ill. Dec. 208, 890 N.E.2d 1127.

In *Freeman,* the Appellate Court of Illinois held that § 17–607(c) is a statute of repose. The Illinois court reasoned that the language of § 17–607 "clearly terminates the possibility of the limited partner's liability after a defined period of time, three years after receiving a distribution, regardless of whether a potential plaintiff knows of his or her cause of action." *Id.* at 939–40, 322 Ill.Dec. 208, 890 N.E.2d 1127. That court further stated:

> Section 17–607(c) defines substantive rights. It does not merely alter or modify a time period within which a cause of action may be brought after accrual but, rather, *extinguishes any right a potential plaintiff has to bring a cause of action against a limited partner for a distribution without regard to whether a cause of action has actually accrued or whether any injury has resulted.*

*Id.* at 940, 322 Ill.Dec. 208, 890 N.E.2d 1127 (emphasis added). The court finds reasoning of *Freeman* persuasive and adopts it as its own. Section 17–607(c) is a statute of repose, not simply a statute of limitations.

Diamond does not address the distinction between a statute of repose and a statute of limitations in his opposition to Friedman's summary judgment motion. Rather, Diamond reasons that "the events [forming] the basis of [Diamond's] unlawful dividend action are, by their nature, concealed,"[32] and therefore, "[e]ven if § 17–607(c)'s three-year statute of limitations were to apply to a limited partner who withdraws from a partnership in violation of DRULPA and the [LP Agreement] . . ., that three-year period should be tolled."[33] Diamond then points out that "Delaware law recognizes three potential sources of tolling: (1) the doctrine of inherently unknowable injuries; (2) the doctrine of fraudulent concealment; and (3) the doctrine of equitable tolling." *EBS Litig. LLC v. Barclays Global Investors, N.A.,* 304 F.3d 302, 305 (3d Cir.2002).

The notion that CCDH's refund of Friedman's $450,000 investment on January 18, 2005, was concealed is belied by the summary judgment evidence.[34] Nevertheless, "[s]tatutes of repose are not subject to equitable tolling." *Munoz v. Ashcroft,* 339 F.3d 950, 957 (9th Cir.2003) (citing *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 363, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991)). Legal tolling on the other hand, which is derived from a statutory source, is "compatible with tolling a statute of repose." *Arivella v. Lucent Techs., Inc.,* 623 F.Supp.2d 164, 177 (D.Mass.2009). Of the three kinds of tolling cited by Diamond, all are equitable in nature. *See Mathews v. Kidder, Peabody & Co., Inc.,* 260 F.3d 239, 256 (3d Cir.2001) ("Fraudulent concealment is an 'equitable doctrine.' "); *Krahmer v. Christie's Inc.,* 903 A.2d 773, 779 (Del.Ch.2006) (noting that the doctrine of inherently un-

---

**32.** Opp'n 12:23–24.

**33.** *Id.* 12:13–15.

**34.** Friedman Decl. Exs. H–I.

knowable injury is a judicial doctrine established by the Delaware Supreme Court). Accordingly, the court cannot toll the period to commence an action under § 17–607(c) as a matter of Delaware law.

While the court considers § 17–607(c) a statute of repose that is not subject tolling, the court still must address two other issues raised by Diamond. First, Diamond contends that § 17–607 is not applicable because the Transfer is not a "distribution" within the meaning of § 17–607(c). Second, Diamond believes that DUFTA's four-year statute of limitation is applicable, irrespective § 17–607(c)'s three-year bar.

a. *The Transfer is a "Distribution" under § 17–607(c)*

■ In his opposition to Friedman's motion, Diamond denies that the Transfer is a "distribution" for purposes of § 17–607(c), stating that:

[Diamond's] Complaint expressly describes the Transfer as a "transfer". . . . [Diamond] did not label the Transfer a "distribution" but simply alleged that, due to CCDH's insolvency at the time of the Transfer, it constituted *an unlawful distribution.*[35]

However, Diamond admits in his Complaint that Friedman received a distribution from CCDH, characterizing CCDH's refund of Friedman's $450,000 investment as "an unlawful distribution under . . . § 17–607(b)."[36] Diamond also concedes that the Transfer was a refund of Friedman's investment in CCDH.[37] Partnership distributions are commonly understood to include the "payment of cash or property to a partner out of earnings or as an advance against future earnings, or a payment of the partners' capital in partial or complete liquidation of the partner's interest." *Interactive Corp. v. Vivendi Universal, S.A.,* 2004 WL 1572932, *3 (Del.Ch. 2004) (internal citation and quotations omitted); Black's Law Dictionary (9th ed. 2009) (same); *Rands, LLC v. Young (In re Young),* 384 B.R. 94, 101 (Bankr.D.N.J. 2008) ("The typical nature of a distribution is the distribution of profits or the return of capital."). *Cf.* 6 Del. C. § 15–101(4) (" 'Distribution' means a transfer of money or other property from a partnership to a partner in the partner's capacity as a partner or to a transferee of all or a part of a partner's economic interest.").

Diamond challenges the validity of the Withdrawal Agreement pursuant to which the refund was made by CCDH to Friedman.[38] The court need not reach this is-

35. Opp'n 12:6–9 (emphasis added).

36. Compl. 5:25.

37. Opp'n 12:11–12.

38. Diamond contends that the Withdrawal Agreement "is contrary to the terms of the Private Placement Memo ... [which] states, 'No person other than Dr. Randy Rosen, Mr. Mark Bidner, or Mr. Scott Rein is authorized on behalf of the Partnership to give any information or to make any representation not contained in this Memorandum and you may not rely on such additional information or representations unless it is in writing, signed by such authorized person' and 'any information or representation not contained in this memorandum must not be relied on as having been authorized by the Partnership.' " Opp'n 2:13–22. Diamond points out "[t]here is no evidence in [Friedman's] Motion of a writing making [the Withdrawal] Agreement or representations constituting the same to [Friedman] and signed by Bidner or Rosen or Rein." Opp'n 2:22–24. Finally, Diamond argues that the LP Agreement contains "an integration clause post-dating the [Withdrawal] Agreement," which states: " 'This agreement constitute[s] the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes all prior written, and all prior and contemporaneous oral, agreements, reps, warranties, statements, promises, and understandings with respect to the subject matter hereof, whether expressed or implied.' " Opp'n 3:1–6.

sue. The Withdrawal Agreement's validity may be relevant to whether or not the distribution to Friedman was *authorized,* but it does alter the court's conclusion that a distribution by CCDH was *made* to Friedman within the meaning of § 17–607.[39] Moreover, Diamond concedes CCDH made a distribution to Friedman which Diamond characterizes in his Complaint as "unlawful under ... § 17–607(b)."[40] Section 17–607(c) focuses "upon an ascertainable category of distributions which are identified as being *wrongful* and which accordingly should be returned by limited partners pursuant to the provisions of [§ ] 17–607." MARTIN I. LUBAROFF & PAUL M. ALTMAN ("LUBAROFF & ALTMAN"), LUBAROFF & ALTMAN ON DELAWARE LIMITED PARTNERSHIPS § 6.10 at 6–26 (2011 Supp.) (emphasis added). For all these reasons,

**39.** Diamond invokes the parol evidence rule to exclude testimony regarding the Withdrawal Agreement. The parol evidence rule is not an evidentiary rule, but one of substantive contract law. *Sellon v. Gen. Motors Corp.,* 521 F.Supp. 978, 983 (D.C.Del.1981). Because the court is analyzing the LP Agreement under Delaware law, the court will apply the Delaware version of the parol evidence rule. *See Travelers Ins. Co. v. Colo. Spanish Peaks Ranch, Inc. (In re Colo. Spanish Peaks Ranch, Inc.),* 661 F.2d 759, 761 (9th Cir.1981) (noting that bankruptcy court in California correctly applied the Colorado version of the parol evidence rule when considering a dispute arising from a note and deed of trust executed in Colorado); *accord Sellon,* 521 F.Supp. at 983 (citing *Three Rivers Motors Co. v. Ford Motor Co.,* 522 F.2d 885 (3d Cir.1975)). In Delaware, "[i]f a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." *Eagle Indus., Inc. v. DeVilbiss Health Care Inc.,* 702 A.2d 1228, 1232 (Del.1997). Ordinarily, under Delaware law, "a stranger to a contract acquires no rights thereunder." *Saudi Am. Bank v. Shaw Group, Inc. (In re Stone & Webster, Inc.),* 558 F.3d 234, 241 (3d Cir.2009) (quoting *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.,* 583 A.2d 1378, 1386 (Del.Super.Ct.1990)). A trustee invoking § 544(b) "stands in the overshoes of the debtor corporation's unsecured creditors." *Hayes v. Palm Seedlings Partners (In re Agric. Research and Tech. Group, Inc.),* 916 F.2d 528, 534 (9th Cir.1990) (citation omitted); *Alberts v. HCA, Inc. (In re Greater Southeast Cmty. Hosp. Corp. I),* 365 B.R. 315, 318 (Bankr.D.D.C.2007) (trustee invoking § 544(b) "steps into the shoes of an unsecured creditor of the estate"). An unsecured creditor is a stranger to a contract because the creditor is "a third person, not a party to, nor representing a party to, the act." *Greater*

*Southeast Cmty. Hosp. Corp.,* 365 B.R. at 318–19 (internal citation and quotations omitted). Therefore, as a stranger to the contract, an unsecured creditor cannot invoke the parol evidence rule. *See id.* at 319. *Cf. Am. Nat'l Bank & Trust Co. v. Matrix IV, Inc. (In re S.M. Acquisition Co.),* 296 B.R. 452, 466 (Bankr.N.D.Ill.2003) (noting that the stranger exception to the parol evidence rule applies in the Seventh Circuit); *Hostmann v. First Interstate Bank of Or. (In re XTI Xonix Techs. Inc.),* 156 B.R. 821, 831 (Bankr. D.Or.1993) (applying the stranger exception under Oregon law); *In re Wolf,* 77 B.R. 51, 54 (Bankr.E.D.Va.1987) (applying the stranger exception under Virginia law).

The parol evidence rule is not implicated here. The court is not using testimony regarding the Withdrawal Agreement to interpret intent, to vary terms of a contract, or to otherwise create ambiguity where contract terms are unambiguous. More importantly, the trustee, stepping into the shoes of an unsecured creditor, is a stranger to the LP Agreement and cannot invoke the rule. Here, the court is simply "consider[ing] some undisputed background facts to place the [LP Agreement] in its historical setting," which is not an impermissible use of parol evidence under Delaware law. *See Eagle Indus.,* 702 A.2d at 1233 n. 7. The court is also mindful that "the 'very essence' of a fraudulent transfer suit is to identify the 'true nature' of a transaction" and the parol evidence rule "can[not] function as a false prophet to preclude consideration of evidence of the true nature of the transaction in question." *Greater Southeast Cmty. Hosp.,* 365 B.R. at 318 (quoting *Gaudet v. Babin (In re Zedda),* 103 F.3d 1195, 1206 (5th Cir.1997)). For these reasons, Diamond's parol evidence objections are overruled.

**40.** Compl. 5:25.

the court finds that CCDH's $450,000 payment to Friedman upon liquidation of his 1.2797033% interest in the limited partnership was a "distribution" within the scope of § 17–607.

b. *DRULPA's Three–Year Statute of Repose Trumps DUFTA's Four–Year Statute of Limitations*

■ Diamond maintains that, even if the court considers the Transfer a distribution, DUFTA's four-year statute of limitations trumps § 17–607(c). Diamond thinks it an "extraordinary proposition that Delaware's three-year statute for recovery of unlawful dividends to partners trumps any other statute of limitations." [41] According to Diamond, "there is no Delaware authority cited by [Friedman] or disclosed by research which holds that the three year Delaware statute [Friedman] cites precludes a fraudulent transfer claim for relief to recover a transfer made as here . . . ." [42]

To address this argument, the court need not look beyond the plain text of the statute, which is where the analysis must begin. *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 162, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981) ("We begin, as always in a case in which the meaning of a statute is at issue, by examining [the] language."). Section 17–607(c) states in relevant part: "a limited partnership shall have no liability *under this chapter or other applicable law* for the amount of the distribution after the expiration of 3 years . . . ." 6 Del. C. § 17–607(c) (emphasis added). Section 17–607(c) is unambiguous; it creates no exceptions for § 17–607(c)'s three-year bar and "make[s] clear that no matter what the basis for liability might be, the three-year expiration period applies." *Freeman*, 383 Ill.App.3d at 938,

322 Ill.Dec. 208, 890 N.E.2d 1127. Stated differently: "[o]ther applicable law includes the Fraudulent Transfer Act" and, "to the extent that a distribution by a limited partnership violates the Fraudulent Transfer Act, the applicable statute of limitations would be three years." LUBAROFF & ALTMAN, LUBAROFF & ALTMAN ON DELAWARE LIMITED PARTNERSHIPS § 6.10 at 6–25 to 6–26 (2011 Supp.).

■ The court must presume that the Delaware legislature "says in a statute what it means and means in a statute what it says . . . ." *See Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) (citations omitted); *see also Estate of Watts v. Blue Hen Insulation*, 902 A.2d 1079, 1083 (Del.2006) ("When construing a statute, courts assume that the legislature intended all words in the statute to have meaning."). "When the words of a statute are unambiguous," as they are here, "then this first cannon [of statutory construction] is also the last: judicial inquiry is complete." *Conn. Nat'l Bank*, 503 U.S. at 254, 112 S.Ct. 1146 (citation and internal quotations omitted). The court concludes that § 17–607(c)'s three-year bar trumps DUFTA's four-year statute of limitations in the context of an alleged wrongful distribution by a limited partnership organized under Delaware law. A contrary reading would offend the plain, unambiguous text of the statute.

Based upon the foregoing, the court concludes that Friedman is entitled to summary judgment on Diamond's First, Second, Third and Fourth Claims for Relief with respect to Diamond's actual and constructive fraud claims under § 544(b) and DUFTA on account of the Transfer be-

---

41. Opp'n 7:1–3.

42. *Id.* 4:4–6.

cause the claims are time-barred under § 17–607(c).

## C. Unlawful Distribution

Diamond's Seventh Claim for Relief is for Unlawful Distribution "under Del. C. § 17–607(b), Cal. Corp.Code § 15905.08(b), Cal. Corp.Code § 15905.09, and other applicable law." [43] Because the court is applying Delaware law to this case, Diamond cannot recover on his causes of action asserted under California law. This leaves § 17–607(b) of DRULPA as the only remaining statute under which Diamond can prosecute his Unlawful Distribution claim.

Section 17–607(b) provides that a limited partner who receives a distribution that violates § 17–607(a) (i.e., a distribution that causes the partnership's liabilities to exceed its assets) is liable to the partnership for the distribution, if the limited partner "knew at the time of the distribution that the distribution violated [§ 17–607(a)]." 6 Del. C. § 17–607(b). "Subject to [§ 17–607(c) ], [§ 17–607(b) ] shall not affect any obligation or liability of a limited partner under an agreement or other applicable law for the amount of a distribution." *Id.* As discussed above, a limited partner shall have no liability on a wrongful distribution under § 17–607(c), if three years have passed since the date of the distribution. 6 Del. C. § 17–607(c). Therefore, "if a limited partner knew at the time a distribution was made that the distribution being made to it was wrongful under [§ ] 17–607(a), after the expiration of the three years from the date of the distribution, the limited partner would not be obligated under [§ ] 17–607(b) to return

the distribution." LUBAROFF & ALTMAN, LU-BAROFF & ALTMAN ON DELAWARE LIMITED PARTNERSHIPS § 6.10 at 6–25 (2011 Supp.).

Here, the court need not divine Friedman's state of mind at the time of Transfer nor determine whether CCDH was insolvent for purposes of § 17–607(a). Diamond has brought the Unlawful Distribution claim more than three years after the Transfer was made, which means that the claim is time-barred under § 17–607(c). Accordingly, Friedman is entitled to summary judgment on Diamond's Seventh Claim for Relief.

## D. Fraudulent Transfer Under § 548

To be avoidable under § 548, a transfer must have been made on or within two years prior to the petition date. 11 U.S.C. § 548(a)(1). Diamond admits that the Transfer was made on January 18, 2005,[44] more than three and a half years after the petition date. Diamond further admits that his "principal claims against [Friedman] are fraudulent transfer claims based on 11 U.S.C. § 544(b) . . . ." [45] Diamond's fraudulent claims under § 548 are time-barred because the Transfer was made more than two years prior to the petition date. Accordingly, Friedman is entitled to summary judgment on Diamond's First, Second, Third and Fourth Claims for Relief with respect to Diamond's actual and constructive fraud claims under § 548 on account of the Transfer.

## E. Unjust Enrichment

Diamond's Sixth Claim for Relief is for unjust enrichment.[46] Under De-

---

**43.** Compl. 5:25–26.

**44.** Opp'n 1:12.

**45.** *Id.* 7:10–11.

**46.** The Restatement requires that the court apply Delaware law to Diamond's restitution claim based on the contractual choice-of-law provision contained in the LP Agreement. Restatement § 221 cmt. d ("The applicable law will be that chosen by the parties if they

laware law, unjust enrichment is an action for restitution. *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del.1988). An individual is required to make restitution if he or she is unjustly enriched at the expense of another. *Id.* To warrant restitution, a plaintiff must show that there was: "1) an enrichment, 2) an impoverishment, 3) a relation between the enrichment and the impoverishment, 4) the absence of justification and 5) the absence of a remedy provided by law." *LaSalle Nat'l Bank v. Perelman*, 82 F.Supp.2d 279, 294–95 (D.Del.2000) (citing *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393–94 (Del.Ch.1999)). "The mere fact that a person benefits another is not itself sufficient to require the other to make restitution." *Chrysler Corp. v. Airtemp Corp.*, 426 A.2d 845, 855 (Del.Super.Ct.1980) (internal citation and quotations omitted).

 "Unjust enrichment is an equitable rather than a legal claim; consequently, no action for unjust enrichment lies where a contract governs the parties' relationship to each other." *McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1091 (9th Cir. 2003) (applying Delaware law); *Wood v. Costal States Gas Corp.*, 401 A.2d 932, 942 (Del.1979) ("Because the contract is the measure of plaintiffs' right, there can be no recovery under an unjust enrichment theory independent of it."); *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del.Ch.2009) ("A claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim.").

 Here, Diamond has no claim for restitution as a matter of law. There is a valid, enforceable LP Agreement between CCDH and Friedman, which—as noted by Diamond—contains an integration clause.[47] There is no evidence that Friedman procured the refund through fraud by making material misrepresentations to Bidner or anyone else at CCDH. Nor is there any evidence that Friedman obtained the refund from CCDH through duress, conversion, or other similar misconduct. Consequently, the fact that the LP Agreement governs the parties' rights is, in itself, reason to hold that there is no claim for restitution on a quasi-contract theory in order to avoid unjust enrichment.

 Setting aside the express agreement, there is another reason that restitution is unavailable to Diamond: the original parties to the refund transaction (CCDH and Friedman) received exactly what they expected in their dealings with one another. Friedman requested a refund of his Investment after Bidner left the hospital project, and CCDH provided the refund. In exchange, Friedman relinquished his LP Interest. Neither party was surprised by the consequences of this transaction. "There is no equitable reason for invoking restitution when the plaintiff gets the exchange which he expected." *Comet Theatre Enters., Inc. v. Cartwright*, 195 F.2d 80, 83 (9th Cir.1952). In this case, CCDH, Diamond's predecessor in interest, received exactly what it expected: the LP Interest in exchange for a refund of Friedman's Investment.

Diamond, stepping in the shoes of CCDH, cannot now disregard CCDH's

---

have made an effective choice under the circumstances stated in § 187."); *Alaska Airlines, Inc. v. United Airlines, Inc.*, 902 F.2d 1400, 1402–03 (9th Cir.1990) (issues arising in restitution action properly resolved under Illinois law in accordance with contractual choice-of-law provision where enrichment was received in the course of performing the contract).

**47.** Opp'n 3:1–2.

prior conduct towards Friedman, take a position contrary to the one CCDH took prepetition, and expect restitution. Such behavior is inequitable and precludes restitution, which is—by its nature—an equitable remedy. *See Fleer Corp.,* 539 A.2d at 1062 (noting that courts consider "fundamental principles of justice or equity and good conscience" in determining if restitution is warranted). There is no evidence to support a prima facie claim for restitution. Accordingly, Friedman is entitled to summary judgment on Diamond's Sixth Claim for Relief.

### F. *Turnover*

■ Diamond's Fifth Claim for Relief is for "turnover." Noncustodial entities with notice of a bankruptcy case holding estate property, or owing a matured debt to the debtor, must deliver that property, or pay the debt, to the trustee, subject to certain exceptions not applicable here. 11 U.S.C. § 542(a)-(b). "The duty to turn over the property is not contingent upon any predicate violation of the stay, any order of the bankruptcy court, or any demand by the creditor." *Knaus v. Concordia Lumber Co., Inc. (In re Knaus),* 889 F.2d 773, 775 (8th Cir.1989) (citation omitted). The turnover duty "arises upon the filing of the bankruptcy petition." *Id.* Turnover may be enforced by commencing an adversary proceeding. Fed. R. Bankr.P. 7001(1). A turnover proceeding is "not intended as a remedy to determine the disputed rights of parties to property; rather it is intended as the remedy to obtain what is acknowledged to be proper-

ty of the bankruptcy estate." *Lauria v. Titan Sec. Ltd. (In re Lauria),* 243 B.R. 705, 708 (Bankr.N.D.Ill.2000); *MCI Telecomm. Corp. v. Gurga (In re Gurga),* 176 B.R. 196, 199 (9th Cir. BAP 1994) ("turnover proceedings involve return of *undisputed* funds").

■ Although Diamond seeks "turnover" of the Transfer, he has made no allegations in the complaint or submitted any evidence in opposition to the summary judgment motion to suggest that the transferred funds are *indisputably* estate property subject to the turnover requirements under § 542. To the contrary, Friedman disputes that the Diamond has any right to the refund under any theory of recovery. Accordingly, Friedman is entitled to summary judgment on the Fifth Claim for Relief because there simply is no legal basis for a stand-alone "turnover" claim in this case.

## III. *CONCLUSION*

For the reasons stated, Friedman is entitled to a summary judgment against Diamond on Diamond's First, Second, Third, Fourth, Fifth, Sixth and Seventh Claims for Relief set forth in his Complaint.[48] A separate order and judgment will be entered consistent with this opinion.

---

**48.** Having determined that summary judgment is appropriate for the reasons set forth herein, the court declines to consider Friedman's alternative arguments for a summary judgment on the causes of action set forth in Diamond's Complaint.